STATE of Missouri, Respondent,

v.

Reva FRANCIS, Appellant.

No. WD 58628.

Missouri Court of Appeals, Western District.

Submitted July 3, 2001.

Decided Sept. 25, 2001.

Motion for Rehearing and/or Transfer to Supreme Court Denied Oct. 30, 2001.

Application for Transfer Denied Dec. 18, 2001.

Willard B. Bunch, Kansas City, for appellant.

Philip M. Koppe, Kansas City, for respondent.

Before THOMAS H. NEWTON, P.J., HAROLD L. LOWENSTEIN, and JAMES M. SMART, JR., JJ.

SMART, Judge.

Appellant Reva Francis was convicted by a jury of murder in the second degree, and armed criminal action in connection with the death of her husband, Tony Francis. She was sentenced to consecutive terms of 23 and 5 years' imprisonment, respectively. Mrs. Francis appeals, alleging seven points of trial error.

## Statement of Facts

In August 1998, Reva Francis was living with her husband, Tony, and her 18 year old daughter, Roxanne Cummings, at their home near Raymore in Cass County. On the afternoon of August 18, Shane Ross, Roxanne's boyfriend, came to the house, planning to take Roxanne on a date. Ross and Roxanne were in Roxanne's bedroom talking and listening to the radio when Tony Francis came home at around 4 p.m. Roxanne briefly stepped out of the bedroom to greet her stepfather.

A while later, Roxanne and Shane Ross heard "something hit the wall" followed by a short pause and then a noise that "[s]ounded like a firecracker." After the first "pop," Roxanne said, she heard her stepfather yell and then a very short time later another "pop." Shane Ross said he heard a shot, screaming, and then another shot.

After hearing the shots, Ross and Roxanne went into the kitchen. They observed Tony Francis slumped over a chair. At that moment the telephone rang. Roxanne answered the phone and found a banker calling for Mr. Francis. Roxanne told the banker Mr. Francis "wasn't there," and hung up. Ross testified that because both Mrs. Francis and Roxanne were "freaking out," he took the cordless telephone outside and dialed 911 to report the matter.

Officer Tony Yates was the first to arrive at the scene of the shooting. After entering the house, Officer Yates saw Mrs. Francis "standing inside the kitchen living room area." She appeared distraught, was shaking, and was standing about two and half to three feet from the body of Tony Francis, which was slumped over a chair. There was a small pool of blood around the victim's head. Mrs. Francis did not appear to have any blood on her body or clothing. Mrs. Francis approached Officer Yates and told him "it was an accident [that] she accidentally shot her husband." The officer inquired where the gun was. Francis pointed to the floor. Yates observed a .32–caliber semi-automatic handgun lying next to her purse.

There was a hole in the side of the purse. Subsequent forensic tests showed that the muzzle of the gun was in contact with the wall of the purse at the time it was fired. Investigators also found a spent shell casing inside the appellant's purse and a second spent shell casing in a flowerpot near the kitchen sink. A checkbook was also lying near the head of Mr. Francis.

Officer Yates asked where the gun was when it went off, and Mrs. Francis stated it was in her purse. She explained to him that "the gun went off in her purse

through a struggle." Francis stated she fired two shots: "there was one shot, some more arguing, then a second shot." Yates testified that he believed appellant had indicated that there had been "[a] few seconds maybe" between the two shots, but he "really c[ould]n't recall" for certain.

Officer Dale Loney arrived at the scene shortly after Yates. He advised Francis of her rights and she agreed to waive her rights and to make a statement. Francis told Loney "that she and her husband had been involved in an argument and that there was a struggle over her purse and there was a gun inside of her purse and that the gun went off." She further told Loney that she and her husband were sitting at the kitchen table at the time the first shot was fired. "There was a struggle over her purse, that he attempted to get her purse from her and that the weapon was in the purse and it went off accidentally." Officer Loney asked Francis on two separate occasions whether she had intentionally shot Mr. Francis. Both times she stated she did not.

Francis was taken into custody. She was interrogated that evening for approximately six hours at the Cass County sheriff's office. After again waiving her rights, Appellant Francis made a written statement, which stated:

I came home around four p.m. Sunday night. We're s[i]tting ... at the dining room table going over bills and [our] checkbook.... He called the secretary to go over bills and I explained to him that I didn't like the gun in the house and I was taking it to Anita's or Lanna's house. He got mad and tried to get the gun out of my purse and my hand was in there, too. Then, the gun went off. I stand up with the gun in my left hand and with the purse in my right hand. Tony fell over the table and onto the chair. The gun went off one more time in

my hand. I dropped the gun and my purse and fell to the ground. I yelled at Shane to call the police.

At one point during the questioning, officers asked Francis to show them how the second shot had been fired. Francis told them, an officer testified, "Tony fell over the chair. She had the gun in this hand, her hand on the right of the purse. She said, leave me the f[_____] alone, pointed the gun down and then did this motion [demonstrating] with her hand, indicating the gun went off another time." Davidson testified that when Francis demonstrated how the gun discharged the second time, it appeared that "when [Francis] extended her arm out, she made a grasping motion with her hand, as if to fire the gun again."

The autopsy revealed that Mr. Francis suffered gunshot wounds to the back of the head, left shoulder and chest, caused by two bullets. There were gunpowder particles on the victim's shirt where one bullet hit him in the chest. The bullet hit him above and to the outside of the left nipple, moving in a slightly downward direction from left to right, front to back. The bullet penetrated the left lung, the heart, and then the right lung before lodging under the skin. A separate bullet entered the back of the head, exited, and ended up in Mr. Francis' right shoulder. The cause of death was listed as "multiple gun shot wounds."

The ballistics test showed that Francis' gun had fired the fatal bullets. The gun had a trigger pull of 15 pounds, which is considered a "heavy trigger pull." The gun had to be "cycled" after inserting the magazine for a round to be fired. There was testimony at trial that a loosely held automatic pistol is unlikely to fire a second time and is likely to jam. The weapon used to shoot Mr. Francis had two safety mechanisms: a magazine safety, which prevented the trigger from being pulled if

the magazine was removed; and a button on the left side of the handgun that had to be turned to the "off" position before the gun would fire.

It was later discovered that following the shooting, Roxanne took Tony Francis' briefcase to Karl Timmerman, the family's lawyer. She denied removing anything from the briefcase. As a result, the prosecution subpoenaed Mr. Timmerman and listed him as a witness, although he was intending to represent Francis. The prosecutor subpoenaed Shane Ross to testify before the grand jury, and talked to him without the presence of his attorney. Francis filed a motion to disqualify the prosecutor, Christopher Koster, contending that the prosecutor knew that Ross was represented by an attorney, and improperly forced him to talk to the prosecutor without his attorney. The motion also alleged improper "intimidation" of Ross by the prosecutor when the prosecutor offered immunity to Ross. The motion also claimed the prosecution acted improperly in subpoenaing Timmerman. The trial court denied the motion.

Following the trial, the jury found Francis guilty of second degree murder and armed criminal action. Francis filed a motion for judgment of acquittal or in the alternative for new trial, which was denied. Later, Appellant Francis filed a motion of defendant for reduction of sentence, in which she sought to introduce evidence that she suffered from battered wife syndrome and major depressive disorder, moderate severity. At the sentencing hearing, the trial court indicated that he had read the motion, but thought the information would have been more relevant if appellant had pleaded guilty. He denied the motion and imposed the sentence recommended by the jury. In informing Appellant Francis of her post-conviction remedies, the court gave the time limitations for a Rule 24.035 motion rather than for a Rule 29.15 motion.

This appeal followed and appellant Francis raises seven points on appeal.

## Point I

■ Appellant Francis' first point relied upon is that the trial court committed plain error in failing to properly advise appellant of her rights under Rule 29.15 and instead advised her of the rights under Rule 24.035, improperly indicating that her deadline for filing a post-conviction motion was 90 days after delivery to the Department of Corrections. Rule 29.07(b)(4) states that where a defendant has a right to proceed under Rule 29.15 or 24.035, "the court at the conclusion of final sentencing shall advise the defendant of such right." Under Rule 29.15(b), the deadline for filing a motion is 90 days after delivery to the Department of Corrections *if no appeal is taken.* If an appeal is taken, it is 90 days after the mandate of the appellate court is issued. The deadlines under Rule 24.035 are the same.

The State responds that while the court's discussion of the time limits was incomplete and the court inadvertently referred to the wrong post-conviction rule, the judge's advice was in substantial compliance with Rule 29.07(b)(4). Accordingly, says the State, the trial court's minor misstatements had no effect on the validity of the sentences he previously had pronounced.

Francis does not meet her burden to show that any error of the trial court was prejudicial. Rule 29.07(b)(4) states in part: "If a defendant has a right to proceed under Rule 24.035 or Rule 29.15, the court at the conclusion of final sentencing shall advise the defendant of such right and shall examine the defendant as to the assistance of counsel received by the defendant." In the instant case, the court

advised Francis of the availability of post-conviction remedies and inquired as to the assistance of counsel received. The only error was in the recitation of the filing deadline. It is difficult to see how this error could have been material, and Francis fails to demonstrate prejudice. This court has held that the failure of a trial court to provide notice of the specific time limit for filing such a motion does not relax the deadline, nor amount to ineffective assistance of counsel. *State v. Johnston*, 786 S.W.2d 220, 222–23 (Mo.App.1990). *See also Reed v. State*, 781 S.W.2d 573 (Mo. App.1989) (trial court failed to advise movant of the ninety day time limitation; court rejected claim that late filing should be allowed, noting that the rule does not require the sentencing court to specifically advise defendant of the ninety day time limit). If a trial court is not required to instruct as to any time limit in which a post-conviction motion must be filed, we do not believe prejudicial error can occur when the court advises a represented defendant of the earliest deadline a defendant faces for any post-conviction relief. Finally, Mrs. Francis now realizes that she has until 90 days after the issuance of the mandate by the court of appeals to file her motion under Rule 29.15. Consequently, there can be no prejudice. Point is denied.

### Point II

■ In her second point, Francis claims the trial court committed plain error when it punished her for taking this matter to trial rather then pleading guilty. Francis said the court punished her when it refused to consider her motion for reduction of sentence filed under Section 557.036.1 RSMo 1994. The trial court, Francis says, ruled that the content of the motion (battered wife syndrome) could properly be considered only if the defendant had pleaded guilty, or at least waived jury trial. The court, Francis says, failed to consider her history and character as mandated by 557.036.1.

■ Generally, the standard of review when a trial court refuses to grant a defendant's motion for reduction of sentence is that of an abuse of discretion. *State v. McClanahan*, 954 S.W.2d 476, 482 (Mo. App.1997). Section 557.036.1 provides:

Subject to the limitation provided in subsection 3 of this section, upon a finding of guilt upon a verdict or plea, the court shall decide the extent or duration of sentence or other disposition to be imposed under all the circumstances, having regard to the nature and circumstances of the offense and the history and character of the defendant and render judgment accordingly.

■ Under this section, the jury fixes the maximum punishment that can be imposed, but "the court makes its own assessment of punishment and will enter a sentence consistent with the facts of the case, which may not exceed the punishment issued by the jury." *McClanahan*, 954 S.W.2d at 482. In her motion, Francis emphasized that she did not admit her guilt of the offenses for which she was convicted, but argued that the jury's sentence recommendation was excessive because the jurors were unaware of facts which might serve to mitigate her punishment. The motion asserted that Francis suffered from post-traumatic stress disorder (battered wife syndrome) and major depressive disorder, and that the victim was on drugs or was suffering from bipolar disorder. These assertions were based on a psychiatric evaluation conducted by forensic psychiatrist William S. Logan, M.D.

In ruling on the motion for reduction of sentence, the trial court made the following statements:

I want to tell you that having read carefully your Motion for Reduction of

Sentence, the things that you raise are matters, which, to me, pretty clearly are matters that would have or should have been raised by a person who would have pled guilty to the charges that have been filed and then requested leniency from the Court at that time.

The arguments that you make are things that would mitigate her behavior if they were true, if the things that you argue were true, and would be things that you would ask the Court to consider, having entered a plea of guilty. Say, Judge, you know, we have not—we've made an election to admit our responsibility herein, and we're asking for the Court to consider these mitigating circumstances and have mercy on my client. The family didn't have to go through a trial, the witnesses didn't have to appear here in court, and she's shown the remorse that would be appropriate for someone who was guilty of the offense with which she's been charged and has now been convicted.

I don't know what else you would say. I'm not being critical of the—the motion that you filed, but that's what immediately came to my mind, and struck me this would have been a fine thing for you to have said to me after a plea of guilty and prior to sentencing.

Then, later in the sentencing hearing, the court said:

[B]ased upon the discussions that were had [at] the pretrial conference the most the defendant was willing to plead to was involuntary manslaughter. At any rate, these are semantic discussions we're having now, and I indicated to you what my reaction was, because that's what I believe.

And those sorts of things, while they may all be true and be important things to have said after a plea of guilty, when it was time for the court to determine what appropriate punishment would be—And we know that in this state the defendant has the right to decide to plead guilty or not guilty, and then if they make an election to plead not guilty, they have a right to decide whether they want to try the case to a jury of their peers or to the court.

* * *

And those are choices that only the defendant can make. When you make a decision to try the case to the jury, and the jury of 12 makes their recommendation, it is not up to me, as far as I'm concerned, to substitute my opinion or position or beliefs for that of the jury. Which is not to say that they differ, it's just to say this is not the time to come in and say well, Judge, you know, we wish that you would impose sentence and let's not consider what that jury of 12 felt to be fair and appropriate. If she wanted to try the case to me, you could have done so and then the punishment that she would have received would have been whatever I believe to be appropriate.

And so I still have an obligation to be, in general, an overseer that makes certain that injustices are not done in sentencing matters, and for that reason I am obliged to consider the recommendation of the jury. And if it were excessive I would be obliged to reduce it, and I would take my obligation seriously in that regard if that's what I believed about the verdict of the jury.

But that's . . . not the case here. And the charges that she was facing were charges that could have resulted in her having been incarcerated for the rest of her life without parole. And the jury considered the situation, as I see it, and found her guilty of the lesser offense, and made the recommendations they made.

Francis argues that the statement made by the trial court indicated he was punishing her for going to trial by refusing to consider the motion for reduction of sentence because she elected to go to trial.

Francis argues that "[w]hether a defendant exercises his constitutional right to trial by jury to determine his guilt or innocence must have no bearing on the sentence imposed," quoting *Thurston v. State,* 791 S.W.2d 893, 897 (Mo.App.1990) (*quoting United States, v. Marzette,* 485 F.2d 207 (8th Cir.1973)). Francis also cites *State v. Wright,* 998 S.W.2d 78, 82–83 (Mo.App.1999), in which the court stated on the record that it made the sentences consecutive rather than concurrent as a direct result of the defendant's choice to go to trial. The reviewing court remanded the case for resentencing. *Id.* at 84.

The court in this case did not indicate that it would have imposed a lesser sentence but for the fact of the jury trial. Rather, the court indicated that in its view the jury sentence in this case was appropriate. The court also notes that if the jury recommendation had been unreasonable, he would have exercised his obligations to reduce the sentence. The court's comments, however, could also be understood as stating that the material Francis attempted to present, even though it related to her history and character, was not pertinent to sentencing because the case had been tried to a jury and the jury had recommended a lawful sentence. In other words, the comments could have reflected the view that whenever a case goes to a jury trial, and the jury recommends a lawful sentence, that sentence will be imposed.

Although the trial court carefully read the motion, it also is not entirely clear that the court believed it had authority to consider the motion in connection with determining sentence. The statement by the judge suggests that the court did not believe it could consider the motion because the court believed such matters could be appropriately considered only when the defendant had either pleaded guilty or had elected to waive the jury. As a consequence, it is not clear that the court actually considered the content of the motion in making his decision to accept the jury's sentencing recommendation. We cannot determine whether the court would have rejected the psychiatric evaluation if the court had believed the court was entitled to consider it.

Section 557.036.1 requires the court to consider, among other things, the history and character of the defendant in rendering its sentence. This is true regardless of whether the finding of guilt was based upon a verdict or a plea. Accordingly, to make sure that it is clear that the court has considered defendant's motion on its merits, we will remand the case to the trial court for resentencing.

### Point III

In Appellant Francis' third point, she alleges that the trial court committed plain error when the State improperly questioned witnesses Shane Ross and Roxanne Cummings about whether Ross had provided Francis with the gun used in the shooting, and about whether Ross had told the business accountant not to take calls from Mr. Francis. Francis argues that the mere asking of these questions, all of which were answered in the negative, created prejudice to her because the very asking of the questions implied the prosecution's belief concerning these matters. Francis says such questions should be allowed only if a good faith basis exists for the question. Appellant cites cases where this rule was applied only to the cross-examination of character witnesses.

Because no objection was made at trial when the questions were asked, and the matter was raised for the first time in the motion for new trial, the matter is not properly preserved for appeal. The State also points out that the trial court is not expected to assist counsel in trying cases and should act *sua sponte* only in exceptional cases. Finally, the State asserts that the good faith basis for the questions was explained in their response to the motion for new trial.

Concerning the alleged instructions to the company bookkeeper, the prosecution asked Shane Ross: "Do you remember calling her on August 18th and asking her not to take any of Tony's calls?" The State then asked "[y]ou don't remember that?" The prosecution also asked Roxanne Cummings: "Do you remember about 15 minutes before Tony came home your boyfriend calling [the bookkeeper] and telling her not to take any phone calls from Tony?" The State then asked, "[y]ou don't remember that?"

Concerning the gun, the prosecutor asked Ross: "Did you give this gun to Reva Francis?" The State also asked, "[D]id you help Reva Francis get this gun?" The prosecutor also asked Roxanne Cummings, "Did you ask Shane to get a gun for your mother?" and "[d]id you see Shane give a gun to your mother?"

 The prosecutor asked each of the questions on his direct examination of the witnesses. Each of the questions was an-

swered in the negative. At the time of the trial, no objection was made to these questions. Trial judges are not expected to assist counsel in trying cases and should act *sua sponte* only in "exceptional circumstances." *State v. Buckner*, 929 S.W.2d 795, 799–800 (Mo.App.1996). A trial court will not be faulted for failing to take corrective action, when that action is not requested. *State v. Burgess*, 800 S.W.2d 743, 746 (Mo. banc 1990). Further, because a decision to object or not is a matter of trial strategy, "[a] party cannot fail to request relief, gamble on the verdict, and then if adverse, request relief for the first time." *State v. McGee*, 848 S.W.2d 512, 514 (Mo.App.1993).

Francis does not provide any authority for the proposition that a prosecutor must be prepared to show a good faith basis for the questions asked of the state's fact witnesses on direct examination. The only cases cited by Francis deal with instances in which the defendant's character was placed in issue.[1] We believe those cases are not germane here, where the questions were asked of fact witnesses. In conclusion, Francis fails to show that the questions asked facially establish substantial grounds for believing that manifest injustice or miscarriage of justice has occurred.[2] Point denied.

## Point IV

 In her fourth point on appeal, Francis argues that statements made by the prosecutor in his closing argument,

---

1. *State v. Myers*, 579 S.W.2d 828 (Mo.App. 1979); *Michelson v.. United States*, 335 U.S. 469, 69 S.Ct. 213, 93 L.Ed. 168 (1948); *United States v. Grajales–Montoya*, 117 F.3d 356 (8th Cir.1997).

2. The State, at the argument on the motion for new trial, offered its basis for the questions. With respect to the instructions to the bookkeeper, the prosecution stated that Ms. Hutchinson told the prosecutor that "Shane

told her 'Reva [Francis] asked me to tell you not to tell Tony.' " With respect to the gun, the prosecutor stated that Ross' name, telephone and other identifying information repeatedly showed up in federal records investigations relating to the gun and to gambling and narcotics charges, causing the prosecution to believe that Ross might have purchased the weapon for Francis' use.

coupled with the trial court's failure to admonish the jury to remember the evidence, after overruling Francis' objection, led to reversible error. The specific statement objected to was, "Tony believed there were financial discrepancies in the company accounts and Reva Francis wanted to keep her——." Francis also complains of the additional statement, "I think I know why Reva Francis killed her husband."

Attorneys are allowed substantial latitude in closing argument, and may suggest reasonable inferences for the jury to draw from the evidence. *State v. O'Haver*, 33 S.W.3d 555, 561 (Mo.App. 2000). "The trial court has wide discretion in ruling on closing argument and in determining whether a particular comment is prejudicial." *State v. Hibbert*, 14 S.W.3d 249, 254 (Mo.App.2000). Therefore, absent an abuse of discretion resulting in prejudice to the defendant, the trial court's rulings will not be disturbed on appeal. *Id.*; *State v. Delaney*, 973 S.W.2d 152, 155 (Mo. App.1998). The Missouri Supreme Court has stated: "A prosecuting attorney's statements must be plainly unwarranted and clearly injurious to the accused to constitute an abuse of discretion." *State v. Mahurin*, 799 S.W.2d 840, 844 (Mo. banc 1990). Even if the prosecutor's argument is improper, relief will be appropriate only if it is apparent that the comment had a "decisive effect on the jury's determination." *State v. Armentrout*, 8 S.W.3d 99, 111–12 (Mo. banc 1999). A "decisive effect" exists only where there is "a reasonable probability that, in the absence of these comments, the verdict would have been different." *State v. Barton*, 936 S.W.2d 781, 786 (Mo. banc 1996). The defendant has the burden of proof to establish "decisive effect." *State v. Reed*, 971 S.W.2d 344, 348 (Mo.App.1998).

Francis argues that the improper argument came in this case when the prosecutor argued that there were discrepancies in the company accounts. Francis says this assertion was not supported by the evidence even though such evidence had been promised in the opening statement of the prosecutor. Francis argues that since there was no evidence of the content of the checkbook on the record, the question of whether or not there were "discrepancies" in the account was left open. It is not clear whether the prosecution was attempting to suggest, as Francis seems to think, that Francis had been stealing from her husband, or whether the prosecution was simply trying to make the point that Mr. and Mrs. Francis were arguing about the accounting records. We note that in his opening statement, Francis' attorney conceded that financial matters were at issue: "Reva's going to tell you what really happened. * * * She's going to tell you that they were arguing about the business, and yeah, they were arguing over money. They were arguing over how she handled the books because Tony didn't understand the books." Further, there was evidence that Francis had informed a detective that shortly before the shooting, Tony and the appellant were sitting around the dining room table "going over bills and [the] checkbook." During the dispute, Tony, according to Francis, called his company's secretary "to go over bills." The word "discrepancy," by itself, does not imply dishonesty, but only a difference or variance. See WEBSTER'S THIRD NEW INT'L DICTIONARY 647 (1971). Francis fails to demonstrate that the use of the word "discrepancies" had a decisive effect on the verdict.

Francis also mentions in the Point Relied On the fact that the prosecutor said, "I think I know why Reva Francis killed her husband." The statement and its context are not discussed in the argument portion

of the brief, however. Accordingly, even though such a statement of the prosecutor's personal opinion is generally not proper, Francis fails to develop an argument concerning this statement. In any event, we do not believe this remark or the remark about discrepancies had a decisive effect on the jury's verdict. Point is denied.

### Point V

▬▬ In her fifth point on appeal, Francis argues that the trial court committed plain error when it failed, *sua sponte*, to give an instruction on self-defense. Francis argues that the instruction must be given when there is evidence to support it, regardless of who introduces the evidence.

▬▬▬ In reviewing a trial court's decision not submit a self-defense instruction, the reviewing court views the evidence in the light most favorable to the defendant. *State v. Gheen*, 41 S.W.3d 598, 606 (Mo. App.2001).

> In order to submit a self-defense jury instruction, the defendant (1) must not have acted as an aggressor, (2) must have reasonable grounds for believing he faced immediate danger of serious bodily injury; (3) must not have used more force that what appears reasonably necessary; and (4) must do everything in his power, consistent with his own safety, to avoid the danger and retreat if possible.

*Id.* The burden is on the defendant to interject the issue of self-defense. *See* Notes on Use MAI CR3d 306.06. However, "[o]nce the evidence, from whatever source, raises self-defense, the burden rests on the state as an element of conviction to prove beyond a reasonable doubt that the homicide was not justified." *State v. Stinson*, 714 S.W.2d 839, 840 (Mo.App. 1986) (*citing State v. Isom*, 660 S.W.2d 739, 742 (Mo.App.1983)).

Francis identifies the following facts as evidence, raising the issue of self-defense:

1) Before they heard the shots, Shane Ross and Roxanne Cummings heard an object hit the wall between the living room and Roxanne's bedroom. Roxanne testified that it was not unusual for Tony to throw things.

2) When Reva said she was going to remove the gun from the house, Tony angrily attempted to seize it from her.

3) The table in the room had turned over when police officers arrived.

4) The gun had a trigger pull of fifteen pounds, considered a heavy trigger pull.

5) The gun had to be "cycled" after inserting the magazine for a round to be in the chamber ready to fire.

6) A semiautomatic pistol is likely to jam, and not fire again, if not gripped firmly when fired.

Even if the evidence is generously interpreted in favor of Francis, the evidence cited by appellant fails to support an inference that Francis was not the initial aggressor. The evidence also fails to support an inference that she did not use more force that was reasonably necessary to protect herself. Finally, the evidence does not support an inference that Francis did everything in her power, consistent with her own safety, to avoid the danger and retreat if possible.

Perhaps recognizing the weakness of the argument, Francis also argues that the trial court erred in granting a motion in limine prohibiting Francis from introducing evidence supporting both self-defense and accident. Francis, however, failed to make an offer of proof as to what evidence of self-defense she would have offered but for the motion in limine. Accordingly, the trial court did not err in failing to offer a

self-defense instruction, which was not even requested by Francis. Point is denied.

## Point VI

In the sixth point on appeal, Francis alleges that the trial court erred when it allowed the State to introduce a thirty-second segment of a videotape interview in which Francis demonstrated how the gun fired the second time. Francis argues this segment tended to create an impression that the gun was fired on purpose. Francis argues that the court violated the rule of completeness by allowing that portion of the tape to be taken out of context, in that it was the only portion of the entire six-hour interview in which Francis did not clearly and steadfastly maintain that the shooting was an accident. Francis wanted to play the entire interview, but the court declined to allow that. The court stated that Francis could play any portion of the tape that she wanted to, but Francis chose not to play any other portion of the tape.

"The rule of completeness seeks to ensure that a statement is not admitted out of context. The rule is violated only when admission of the statement in an edited form distorts the meaning of the statement or excludes information that is substantially exculpatory to the declarant." *State v. Skillicorn,* 944 S.W.2d 877, 891 (Mo. banc 1997). When there is no risk of distortion or failure to exclude substantially exculpatory statements, however, "it is not an abuse of discretion to fail to require the production of the remainder [of the statement]. . . . ." *State v. Collier,* 892 S.W.2d 686, 695–96 (Mo.App.1994) (editing in text). In both *Skillicorn* and *Collier,* the courts found that the additional statement which the respective defendants wanted to introduce was not substantially exculpatory to the declarant. In this case, Francis

does not identify what specific statements should have been included, but rather argues that the entire tape should have been introduced. Francis was given the opportunity to play portions of the tape that could have created an inference that the segment of the tape played by the State did not accurately reflect the rest of the interview. She chose not to do so.

Francis suggests that the record hints there may have been a more extensive ruling by the trial court off the record prohibiting Francis from playing *any* portion of the tape. Francis points to a colloquy in closing argument, when the court stated:

You know darned well that you can't tell the jury that it's somehow the State's fault when I make evidentiary rulings, you can't put stuff in evidence knowing that it's improper to argue that the State didn't put something in evidence when I ruled. It was inappropriate, so stop that.

MR. GEPFORD: I'm sorry, Judge I thought it was adverse inference and appropriate.

THE COURT: It's what I ruled out. You all wanted to put it in, I told you you couldn't. . . . You can't comment on that as if the state did something about it.

This dialogue does not demonstrate that the court kept the defense from introducing other portions of the tape of the interview. There is no record that the court flatly prohibited Francis from introducing any other part of the tape. The statement made by the court is not inconsistent with the ruling made on the record that Francis could not play the *entire* six-hour interview, but could play those portions she wanted. Francis fails to demonstrate that the trial court abused its discretion in this ruling. Point is denied.

## Point VII

█ In Francis' seventh point, Francis attempts to assert that the prosecutor should have been disqualified. The Point Relied On does not comply with Rules 30.06 and 84.04, and therefore does not preserve anything for appeal.[3] In any event, we fail to see any facial indication that there are substantial grounds for believing that the trial court was required to disqualify the prosecutor, or that any miscarriage of justice or manifest injustice resulted. Point denied.

## Conclusion

The judgments of conviction are affirmed. The sentences are vacated, and the case is remanded to the trial court for resentencing after consideration of the mo-

---

3. Point VII of Francis' brief states as follows:

The court committed plain error when it overruled Defendant's motion to disqualify the prosecuting attorney, because the actions of the prosecutor clearly indicated an ongoing determination to convict defendant by fair means or foul, in violation of her rights to due process under the Fourteenth Amendment to the Constitution of the United States. Before the court heard defendant's motion to disqualify the prosecutor, the prosecutor:

a. Caused defendant's then attorney, Karl Timmerman to be endorsed as a witness, which prevented him from acting as counsel for defendant, under Missouri Supreme Court Rule 4–3.7.

b. Twice misused his prosecutorial investigative subpoena power, under Section 56.085, RSMo., by issuing subpoenas without making the required request to a circuit judge, to harass witness Shane Ross, and to seek documents in the possession of defense counsel Randell Wood.

c. Misused his grand jury subpoena power, under Section 540.160 by causing a subpoena to be issued after return of the indictment, to Shane Ross, known to him to be a witness for the defendant.

d. Interrogated Shane Ross in his office, knowing him to be represented by counsel, after having asked and been denied permission to interview Ross out of the presence of his attorney.

e. Attempted several times again to contact Shane Ross directly by telephone for the purpose of questioning him further, finally threatening to have Ross "picked up" if he did not come down to the prosecutor's office voluntarily. This action, and the actions stated in paragraphs B, C, and D, above caused witness Ross to feel intimidated.

f. Filed a motion, not supported by any legal precedent, to force the defendant to choose between introducing evidence tending to support both accident and self defense, as "inconsistent" defenses.

After the ruling on the motion to disqualify, he:

g. Improperly questioned prosecution witnesses Shane Ross and Roxanne Cummings on direct examination, without a good faith basis, concerning whether or not Mr. Ross had provided Defendant with the [gun] which shot her husband, and whether or not Shane Ross had telephoned the couple's assistant bookkeeper, to tell her not to talk to Tony.

h. Avoided, although he did not directly violate the requirement to disclose an object disclosable under Missouri Supreme Court Rules 25.03A(6) and 25.08 an anatomical model he intended to introduce at trial, by not having the model prepared until the day before it was presented in court.

i. Improperly argued, without evidentiary support, that Defendant's husband believed there were discrepancies in the accounts of their company.

The Point Relied On fails to state the legal basis for concluding that the trial court committed error in refusing to disqualify the prosecutor in that there is no specification of legal reasons supporting the claim of reversible error. In other words, it is not self-evident that the prosecution's alleged tactics required disqualification of the prosecutor from the case as opposed to some other discipline or supervision, if indeed any improper actions were performed. Also, the argument portion of the brief cites no authority for the proposition that the proper remedy for any improper prosecution tactics is disqualification of the prosecutor, as opposed to other methods of dealing with any improprieties.

tion of the defendant related to sentencing considerations.

NEWTON and LOWENSTEIN, JJ., concur.