STATE of Missouri, Respondent,

v.

Christopher Todd ROPER, Appellant.

No. WD 62613.

Missouri Court of Appeals,
Western District.

June 29, 2004.

Kent Denzel, State Public Defender Office, Columbia, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Andrea Kaye Spillars, Charnette D. Douglass, Office of Attorney General, Jefferson City, for respondent.

RONALD R. HOLLIGER, Judge.

Todd Roper appeals his convictions of numerous offenses, including forcible sodomy, kidnapping, first-degree burglary, and multiple charges of first-degree assault and armed criminal action. He argues that the trial court committed three errors. First, he contends that the trial court erred by denying his motion for a judgment of acquittal on one of the first-degree assault charges, based upon a claim of insufficiency of the evidence. Second, he argues that the trial court erred in refusing to permit him to introduce into evidence a greeting card sent to him by the victim. Third, he claims that the trial court erred in failing to take *sua sponte* action with regard to the State's improper cross-examination of him, following his testimony on direct examination. We find that the prosecutor was guilty of serious misconduct but under the plain error standard there was no manifest injustice. We find no reversible error in the other points and, therefore, affirm the convictions.

## Factual and Procedural Background

Todd Roper and Melinda Trenary[1] first met in January 2001, began a relationship roughly three months later, and subsequently moved in together in August 2001. Their relationship was not a placid one. Roper allegedly assaulted Trenary in November 2001, leading to the filing of criminal charges against him. He was ultimately released on bond with a condition that he avoid contact with Trenary. Despite that bond condition, he continued to live with her after his conditional release. In early 2002, though, Roper moved to a different residence.

On February 6, 2002, Roper called Trenary to determine whether she intended to testify against him regarding the November 2001 assault charge. She told him that she had not been contacted about the case, but would testify if she was. Roper became upset and verbally abusive on the phone, telling her that she would be ruining his life. When asked whether he was threatening her, Roper said that she could

---

1. Trenary married prior to trial, but we elect to refer to her by her surname at the time the events occurred that led to the case at bar.

"take it" as she wanted. Trenary hung up the phone at that point, and Roper tried calling back multiple times, until she turned off the ringer to the phone.

Shortly after Roper moved out of Trenary's apartment, she had begun spending time before and after work with a co-worker, Charles White. On the afternoon after Trenary had her phone conversation with Roper, she and White had their first "formal" date. After the date, they returned to Trenary's apartment. The apartment had two entrances: one through the front entry of the house and the front stairs, the other through a rear stairwell and deck, which she used as her main entrance to the apartment.

After arriving at her apartment, Trenary changed into a nightgown, and the two sat on her bed, talking and playing cards. Trenary was sitting at the head of the bed, with her back against the wall, while White lay across the foot of the bed, facing her. White's back was to the main doorway to the bedroom. After thirty minutes of cards, Trenary leaned over to kiss White, when she heard a creaking sound from the apartment floor.

At that point, Roper rushed into the bedroom, wielding a board over his shoulder like a baseball bat. Trenary cried out in warning, but Roper struck White in the head with the board, just as White was turning around toward Roper. The blow opened a broad laceration in White's forehead that bled profusely.

Roper attempted to grab Trenary, yelling "I'll kill you, Bitch." White struggled with him, to prevent Roper from reaching her. While the two were grappling, Trenary attempted to call the police on the bedroom phone, but was unable to get a dial tone. She attempted to get out of the bedroom, but Roper cut her off each time she started to move toward one of the bedroom doors. Roper told White during the struggle that it had nothing to do with him, that "he had warned" her and "that he wasn't going to jail over nothing, that he was going to kill [her]."

Trenary attempted to grab the board that Roper was still carrying. At that point, Roper managed to take hold of Trenary's hair and used it to pull her down to her knees, while he continued to fight with White. In addition to his physical battle with White, Roper also started kicking Trenary. The two fought until they were tired. White unsuccessfully tried to convince Roper to let him go to the hospital. He reiterated his intention to kill Trenary. Becoming agitated again, Roper told White "I had a—I should have brought my gun in here with me, and I have a bullet for you. I'll kill you, and if I have to, I'll kill myself." Roper started to drag Trenary out of the bedroom, at which point White resumed the fight with Roper. During this second stage of the confrontation, White felt "two sharp blows" to his back. He would later learn at the hospital that Roper had stabbed him.

The confrontation continued, with Roper dragging Trenary through the hallway toward the kitchen and the rear entry. As Trenary was pulled past the door, she unlocked it, hoping to escape. Roper noticed her action and began to beat her again. She managed to get the door open, and yelled at White "just go and get me some help," at which point White escaped from the apartment.

Immediately after White fled, Roper shut and relocked the door. He grabbed a knife from the kitchen. Then, still holding Trenary by the hair and struggling with her, he pulled a nearby dresser across the door to block it from opening, preventing entry from the outside. He then similarly blocked the front entrance to Trenary's apartment. Roper repeatedly told Tre-

nary that she was going to die. Meanwhile, White had paused, listening to the continuing battle inside the apartment, as Roper barricaded himself and Trenary in the apartment. White then went down the steps and saw a police car driven by Boonville Police Sergeant Jere Lang passing by on the street. White flagged the vehicle down. Lang put White in the car and called for assistance before taking him to the hospital.

When the police arrived at the apartment Roper slid down and sat against a wall, placing Trenary in front of him. He held her hair in one hand and the kitchen knife in the other, blade pressed against her throat. When the police officers shouted out, asking what was going on, Roper replied, "I'm going to kill this bitch." The officers tried to persuade Roper to come out and talk about it, but he refused, telling them that he would kill her if they entered the apartment and would kill himself, if necessary.

The officers testified that Roper was angry and used extensive profanity in his exchanges with them. One of the officers, Corporal Abel, told Roper that he needed to see that Trenary was okay. Roper pushed her face against a window with her next to him. The officer could see blood on Trenary's face, but could not make out the extent of her injuries. Some time later, additional officers arrived on the scene, including Lieutenant Welliver, who had known Roper since they were young, who continued to try to talk to Roper, to no avail.

The standoff continued into the following morning. The Highway Patrol Special Emergency Response Team (SERT) joined Lieutenant Welliver and the other local police officers in attempting to bring the situation to a close. During that time, Welliver heard Trenary scream numerous times as if in pain. Roper continued to drag Trenary around the apartment by her hair. In the process, he pulled entire clumps of hair out of her head. Roper also cut another swath of hair off of her head with a knife. He would also keep her between him and doors and windows, apparently fearing that the law enforcement officers would otherwise shoot him.

Roper usually kept a knife at Trenary's neck. When pressured by the police, he would tell them to "back off," pressing the knife harder against her throat. At other points, Roper would pass the knife across Trenary's body. He also struck her with both the blade and the handle of the knife. On one of those occasions, he hit her with enough force to break off the knife's handle, forcing him to go to the kitchen for a replacement. He also hit her with his hands on numerous occasions. Trenary testified that Roper struck her hard enough in the head at various points that she "would just go black for a minute."

Despite the sub-freezing temperatures outside, Roper had turned off the heat to the apartment, to help him stay awake. When Trenary asked to have a robe or blanket to keep warm, he instead tore her nightgown off, and she remained unclothed for the remainder of the night. After sunrise, Trenary was sitting "hunched up" in an attempt to stay warm. Roper ordered her to sit up and to stretch her legs out. He then took a beer bottle, telling her that, "Since I interrupted what you were planning on doing," apparently regarding Mr. White, "this should do it for you." Trenary refused, and another struggle began, but Roper struck her and overpowered her. He proceeded to penetrate her a number of times with the neck of the bottle.

Sometime after 7:00 A.M., the law enforcement officers tried one more time to initiate negotiations with Roper. While Lieutenant Welliver was on the back porch

talking with Roper, the SERT team made a tactical entry through the apartment's front entrance. When Roper heard noises from the front of the apartment, he pulled Trenary to the bedroom doorway. The officers continued to enter the apartment, and confronted Roper with firearms drawn. Roper was standing in the doorway, holding Trenary up by her hair and pressing a knife against her throat. In a single motion, he pushed her away and dropped the knife, permitting the police to take him into custody.

Trenary was taken to the hospital. She had suffered extensive bruising and at least ten lacerations. She sustained injuries to her hands, due to Roper stepping on them. Both of her eyes were blackened and her lip had been split, requiring stitches to close. A lump the size of half a baseball was on one side of her head. She also had a hematoma under her scalp from her head injuries. One of her ears was heavily bruised and discolored. She was kept overnight for observation, due to her head trauma, and was discharged on February 8, 2003.

White's injuries included two stab wounds to his back and a serious gash in his forehead. The latter injury required between thirty and forty stitches to close. He was discharged a few hours after arriving at the emergency room. Since his discharge, he continues to have headaches and occasional numbness around his eyebrow as a result of his head injury. He also experiences occasional soreness where he had been stabbed in the back. He was bedridden for ten days following the incident and missed a total of ten days of work. He has not sought any follow-up care for his injuries, however.

Trenary also missed ten days of work as a result of her injuries. Since the incident, Trenary complains of frequent, continuing, and severe headaches; ringing in her injured ear; and discomfort and popping in her jaw. She also testified that she continued to have stiffness in one of her fingers from her injuries. She sought treatment from her primary care physician, who indicated that she would need to seek treatment from a TMJ specialist regarding her jaw problems. As of the date of trial, she had not pursued any further medical treatment regarding her injuries.

An indictment charged Roper with the offenses of assault in the first degree (two counts), felonious restraint, kidnapping, and forcible sodomy, each of which included companion charges of armed criminal action. The indictment also charged Roper with the offenses of unlawful use of a weapon and burglary in the first degree. A substitute information was later filed, dropping the felonious restraint charge.

At trial, Roper claimed that he had only gone to Trenary's apartment to see her. He did not deny engaging in a physical altercation with White, but he claimed that sudden passion and anger upon seeing White kissing Trenary, who Roper still considered his girlfriend, prompted his actions. Roper testified that he let White leave the apartment voluntarily after the two fought. He also denied assaulting or injuring Trenary after White left the apartment, claiming that all they did together was talk until he was taken into custody. At the conclusion of trial, the jury returned a verdict convicting Roper on all counts.

## Discussion

### Sufficiency of the Evidence Regarding First Degree Assault on Trenary

In his first point on appeal, Roper argues that the trial court erred in overruling Roper's motion for judgment of acquittal at the close of the evidence regarding the offense of first degree assault upon

Trenary, as the evidence did not support a conclusion beyond a reasonable doubt that she suffered "serious physical injury." He argues that the only evidence was that Trenary suffered only superficial abrasions and contusions and that those injuries did not create a substantial risk of death or cause serious disfigurement or protracted loss or impairment of the function of any part of her body.

In reviewing a claim of insufficiency of the evidence in a criminal case, we view the evidence in the light most favorable to the verdict. *State v. Copeland*, 928 S.W.2d 828, 847 (Mo. banc 1996). We accept as true all evidence favorable to the verdict, including all favorable inferences, unless they are "unreasonable, speculative or forced inferences." *State v. Whalen*, 49 S.W.3d 181, 184 (Mo. banc 2001) (quoting *Bauby v. Lake*, 995 S.W.2d 10, 13 n. 1 (Mo.App.1999)). Nor will we supply missing evidence. *See id.* We disregard contrary inferences, "unless they are such a natural and logical extension of the evidence that a reasonable juror would be unable to disregard them." *State v. Grim*, 854 S.W.2d 403, 411 (Mo. banc 1993). We will affirm if we conclude that the evidence, viewed through this lens, was sufficient for a reasonable person to find the defendant guilty beyond a reasonable doubt. *Copeland*, 928 S.W.2d at 847.

The offense of first-degree assault is defined in Section 565.050.1, RSMo. The statute provides that the crime of first-degree assault has been committed "if he attempts to kill or knowingly causes or attempts to cause serious physical injury to another person." *Id.* "Serious physical injury," in turn, is defined in Section 565.002, RSMo, as "physical injury that creates a substantial risk of death or that causes serious disfigurement or protracted loss or impairment of the function of any part of the body." § 565.002(6), RSMo.

Roper's arguments truly address only one of the three grounds upon which a finding of serious physical injury may be established, however.

The bulk of Roper's argument questions whether there was substantial evidence that Trenary's injuries caused a "protracted loss or impairment" of any part of Trenary's body. "Protracted loss or impairment" has been defined as "a decrease or diminishing or damaging of an action or ability of the body to do that for which it is intended" that is "something short of permanent but more than of short duration." *State v. Norwood*, 8 S.W.3d 242, 246 (Mo.App.1999). No minimum degree of trauma is required, provided that the loss or impairment is more than momentary. *Id.*

Here, Trenary testified at trial that she continued to regularly have problems with headaches due to the incident, as well as persistent problems with her jaw and one of her index fingers. While Roper contested that evidence by showing that Trenary has not sought medical treatment for those concerns, it was up to the jury to believe or disbelieve her testimony. Viewing the evidence in the light most favorable to the verdict, Trenary's testimony arguably satisfies the minimum requirements to establish protracted loss or impairment had resulted from Roper's actions.

More significantly, Roper fails to meaningfully address another ground that supports a finding of "serious physical injury" under the facts before us, namely the infliction of injuries that result in serious disfigurement of the victim. *See* § 565.002(6), RSMo. Roper does not discuss this ground in anything but the most cursory manner. The State, however, argues that it provides a solid basis for upholding Roper's conviction of first degree assault with regard to Trenary. We agree.

Disfigurement is defined as "to deface or mar the appearance or beauty of someone." *State v. Bledsoe*, 920 S.W.2d 538, 540 (Mo.App.1996). While the definition of "serious physical injury" refers to *serious* disfigurement, our interpretation of that term is guided by a number of cases, both from this court and our fellow districts, that establish that Trenary's injuries were sufficient to result in serious disfigurement.

In *Bledsoe*, a 1.5 inch facial scar was found sufficient to establish serious disfigurement, though admittedly over a vociferous dissent. The *Bledsoe* majority established a number of factors for consideration regarding the question of whether there has been serious disfigurement. Among those factors are the permanency of any scarring; its location, length, or size; and any additional injuries. *See id.*

While permanency is a factor, subsequent cases have made it clear that disfigurement does not have to be permanent to qualify as "serious" under Section 565.002(6), RSMo. In *State v. Immekus*, 28 S.W.3d 421 (Mo.App.2000), evidence that the defendant shaved off the victim's eyebrows and cut her long hair to a length of 1.5 inches with a razorblade was held to be sufficient to establish that serious disfigurement was inflicted on the victim, supporting a conviction of first-degree assault. *Id.* at 427. Evidence that the victim was mud-smeared and suffered from extensive swelling, bruising, and scratching as the result of her assailant's attack was found to be sufficient to qualify as serious disfigurement to support a conviction of second-degree assault[2] in *State v. Raines*, 118 S.W.3d 205, 210–11 (Mo.App.2003).

Applying those cases in the present context, there was clearly sufficient evidence in the record that Trenary had suffered seriously disfiguring injuries. Trenary suffered multiple visible injuries to her head and face. She had suffered a split lip that required stitches to close. In addition to those injuries, Roper had pulled or cut large amounts of hair off her head. We find no reason to distinguish *Immekus* or *Raines*, and conclude that a reasonable juror could find, beyond a reasonable doubt, that Roper had seriously disfigured Trenary as a result of his prolonged assault. We, therefore, deny his first point on appeal.

### *Refusal to Admit the Greeting Card from Trenary*

In his second point, Roper claims that the trial court abused its discretion in sustaining the State's objection to defendant's Exhibit 7. Said exhibit was a greeting card from Trenary to Roper, which he contended was admissible to establish Roper's relationship with Trenary, her bias against him, and to impeach her credibility regarding her trial testimony that she had done nothing to Roper that she needed to apologize for.

The trial court has broad discretion with regard to the admission or exclusion of evidence, and we may reverse only upon a showing that its discretion was abused. *See State v. Williams*, 97 S.W.3d 462, 468 (Mo. banc 2003). An abuse of discretion

2. There are multiple differences between the offenses of first-degree assault and second-degree assault. For the purposes of this case, the distinction between the two offenses is not the severity of the resulting injuries, but rather the mental state of the defendant in committing the crime. To constitute first degree assault, the defendant must be found to have *knowingly* inflicted serious physical injury. § 565.050, RSMo. A defendant will be found guilty of second-degree assault, however, if he *recklessly* caused serious physical injury or knowingly caused or attempted to cause serious physical injury *under the influence of sudden passion arising out of adequate cause.* § 65.060, RSMo.

occurs when the trial court's ruling is clearly against the logic of the circumstances before the court and is so arbitrary and unreasonable that it shocks the sense of justice and indicates a lack of careful consideration. *State v. Brown*, 939 S.W.2d 882, 883–84 (Mo. banc 1997).

The card was apparently given to Roper in June or July 2001, seven or eight months before the confrontation that led to the present matter. The front of the card featured a drawing of a teddy bear and the text, "When you're not around." Inside was the pre-printed message, "I'm one lonely bear," followed by Trenary's notation, "without you." The card also contained the following inscription:

I am very sorry for all the times I get to acting crazy because you don't call enough or pay me enough attention. When I start to get on your nerves with that stuff just try to think of this card. It explains why. I just miss you!

I love you,

Mindi

Roper first contends that the card was relevant and probative because it was evidence of Trenary's bias. The difficulty with that argument, however, is that Roper never truly explains, either during trial or on appeal, *how* the card establishes any bias on Trenary's part. We find Roper's argument unpersuasive on this issue.

Roper next argues that the card was admissible because it contradicted Trenary's testimony that Roper was a "freeloader" in the relationship. The card does nothing to contradict Trenary's testimony that Roper made minimal financial contributions towards the household when they were living together.

Lastly, Roper claims that the card was admissible to impeach Trenary's testimony that she had done nothing for which she needed to apologize to Roper. During her testimony, Trenary did not deny ever having needed to apologize to Roper about anything during their relationship, only that she could not recall any such circumstance. As such, admission of the card would not have been proper impeachment.

Ultimately, the card was of minimal relevance to Roper's defense. It was unnecessary to establish the relationship between Roper and Trenary, as there was no dispute that they were once romantically involved. This exhibit would shed no additional light on the issues he sought to raise at trial. Arguably, the card would have been, at best, cumulative of other evidence.

We conclude, therefore, that the trial court did not abuse its discretion in refusing to allow the admission of this exhibit into evidence. Roper has not shown that the card had any real probative value with regard to the issues raised at trial or that it impeached Trenary's trial testimony. Point denied.

### *Improper Questioning of Roper on Cross–Examination*

In his last point, Roper contends that the trial court erred in failing to intervene *sua sponte* when the prosecutor improperly posed questions to Roper in cross-examination asking him whether certain law enforcement witnesses had lied in their testimony.

In at least six instances during cross-examination of Roper, the prosecutor asked Roper to comment on the veracity of law enforcement officers' testimony. For example, the following exchange took place during Roper's cross-examination:

Q. You heard their testimony. You heard Sean Abel's testimony. He specifically said you repeated that you were going to kill her several times during his discussions with you. Are you denying that?

A. I never said I was going to kill her.

Q. Never said you were going to kill her?

A. No.

Q. So when Lieutenant Welliver testified that you told him repeatedly that you were going to kill her, are you saying that's not the truth?

A. I never told him that.

Q. You never told him that?

A. No.

This exchange was but one of several similar occasions during the prosecutor's cross-examination. In some of the other instances, the prosecutor would recapitulate a portion of one of the officers' testimony, and inquire whether that officer's testimony was not the truth. At other points, the prosecutor would more directly ask Roper whether he thought the officers were lying. Defense counsel never raised any objections to this questioning. Roper now contends that the trial court should have intervened to take action to stop the prosecutor's improper questioning.

 Trial courts have substantial discretionary latitude in controlling cross-examination. *State v. Smith*, 534 S.W.2d 604, 610 (Mo.App.1976) (quoting *State v. Graves*, 352 Mo. 1102, 182 S.W.2d 46, 53 (1944)). Where such issues has been properly preserved, we will only reverse upon a showing that the trial court abused its discretion and the defendant was prejudiced as a result. *State v. Oates*, 12 S.W.3d 307, 313 (Mo. banc 2000).

 Due to the lack of any objection by counsel regarding this category of questioning, we are limited to plain error review in the present circumstance. Under that standard, we may review the claim of error under a two-prong standard. *See State v. Scurlock*, 998 S.W.2d 578, 586 (Mo.App.1999). In the first prong, we determine whether there is, indeed, plain error, which is error that is "evident, obvious, and clear." *Id.* If so, then we look to the second prong of the analysis, which considers whether a manifest injustice or miscarriage of justice has, indeed, occurred as a result of the error. *See State v. Williams*, 9 S.W.3d 3, 12 (Mo.App.1999). A criminal defendant seeking plain error review bears the burden of showing that plain error occurred and that it resulted in a manifest injustice or miscarriage of justice. *Id.* The outcome of plain error review depends heavily on the specific facts and circumstances of each case. *See id.*

The principle that a witness should not be asked to opine upon the truth or veracity of another witnesses' testimony has a long history in Missouri. In *Holliman v. Cabanne*, 43 Mo. 568, 570 (1869), the Missouri Supreme Court stated, "Witnesses should not give their opinions upon the truth of a statement by another witness, though they may do the same thing in effect by denying the fact stated."

In 1995, this court reaffirmed that principal in *State v. Savory*, 893 S.W.2d 408 (Mo.App.1995), when it found that the trial court erred in overruling the defendant's objection to such questioning. We held that "when seeking to expose contradiction between the testimony of several witnesses, an attorney may not directly ask one witness if another was lying." *Id.* at 411. While the use of such questioning did not lead to a reversal in *Savory* (we held that the defendant was not prejudiced because the nature of the disparity in the state and defense witnesses was so marked that witness credibility was a major issue in the case), the Court included a stern caution regarding its permissibility. *See id.* The discussion of the issue concludes with a comment by the court that "[a]rgumentative questioning of this type should

not be continued, and objections to such questions should be sustained." *Id.*[3]

Roper raises a serious issue that posing such questions to a criminal defendant places him in an untenable position. By objecting to such questions, a defendant could look evasive, but answering could put him in an even worse light. Roper also heavily relies upon a recent pronouncement by the Iowa Supreme Court that discusses how such questions violate the prosecutor's duty to conduct a fair trial:

> [T]he use of this tactic—asking the defendant whether another witness is lying—is incompatible with the duties of a prosecutor. Unfairly questioning the defendant simply to make the defendant look bad in front of the jury regardless of the answer given is not consistent with the prosecutor's primary obligation to seek justice, not simply a conviction. Nor is such questioning consistent with the prosecutor's duty to the defendant to ensure a fair trial, including a verdict that rests on the evidence and not on passion or prejudice.

*State v. Graves,* 668 N.W.2d 860, 873 (Iowa 2003).

We are aware of only two jurisdictions (Georgia and Maryland) that have taken the position that such questions are not objectionable and are, presumably, valid tools in the prosecutor's arsenal. *See, e.g., Whatley v. State,* 270 Ga. 296, 509 S.E.2d 45 (1998); *Fisher v. State,* 128 Md.App. 79, 736 A.2d 1125 (1999). They are unpersuasive.[4]

The discomfort many courts feel about this type of question arises from a number of grounds. First is the fact that, in most circumstances, this type of question has no probative purpose and "is not intended to seek information at all but instead to score rhetorical points." *Allen v. United States,* 837 A.2d 917, 920 (D.C.2003). The Iowa Supreme Court opined,

> We think the predominate, if not sole, purpose of such questioning is simply to make the defendant look bad.... The accused's answer is unimportant because the accused is in a no-win situation. If the defendant says the other witness *is* lying, then the defendant is put in the position of calling someone a liar, a particularly unenviable state when the other witness is a law enforcement officer. If the defendant says a contradictory wit-

**3.** Missouri is not alone in its disapproval of such types of cross-examination. A number of other jurisdictions, both federal and state, have addressed this issue. *See People v. Foster,* 111 Cal.App.4th 379, 3 Cal.Rptr.3d 535, 539–40 (2003). Many of those jurisdictions have held that asking such questions is *per se* improper, constituting prosecutorial misconduct. *See id.* In discussing the approaches taken by the various courts in reaching that conclusion, the *Foster* court observed:

> The courts in those cases explain that these questions infringe upon the jury's right to make credibility determinations, or that the questions are misleading because they suggest that the only explanation for the discrepancy between defendant's testimony and the other witness' testimony is that one of them is lying. Moreover, the questions

might be considered misleading or calling for a conclusion in that they suggest that the defendant can know what another witness was thinking.

*Id.* at 539.

**4.** A third group of jurisdictions takes a middle view, holding that such questions are not always misconduct or always inappropriate, but that the propriety of such questioning depends on the circumstances of the case. *See Foster,* 3 Cal.Rptr.3d at 540. In these cases, the appellate courts have essentially decided to treat the issue on a case-by-case basis, rather than adopting a bright-line rule, thus allowing trial courts to determine the propriety and potential prejudice of such questioning based on the circumstances of the particular case.

ness is *not* lying, then a fair inference is that the *defendant* is lying.

*Graves,* 668 N.W.2d at 872 (citations omitted).

Second, as discussed by the *Graves* court, the tactical use of such a question is incompatible with the prosecutor's responsibilities at trial. *See id.* at 873. The use of such questions "diverts the jury from its proper focus on whether the relevant evidence establishes the elements of the crimes charged." *Id.* at 873 n. 3. Such questions " 'create the risk that the jury may conclude that, in order to acquit the defendant, it must find that the witness has lied,' a risk that 'is especially acute when the witness is a government agent in a criminal case.' " *Allen,* 837 A.2d at 920 (quoting *State v. Singh,* 259 Conn. 693, 793 A.2d 226, 237 (2002)).

■■ Returning our focus to the case at bar, it is clear that the prosecutor's questioning violated the prohibitions set forth in *Savory.* Indeed, the State essentially concedes that the specific questions used by the prosecutor in asking Roper to comment upon the truth of other witnesses' testimony were improper. Nor are we dealing with an isolated incident. Instead, the prosecutor repeatedly asked Roper to comment whether he thought the police officers were lying. The prosecutor's use of these improper questions was a theme that the prosecutor returned to a number of times during Roper's cross-examination.

■■ But because of the lack of any objection, we are asked to determine whether the trial court plainly erred in failing to take any corrective action with regard to the prosecutor's improper cross-examination. Generally speaking, a trial court has an obligation to ensure that a criminal defendant has a fair trial, includ-

ing the obligation to exercise its discretion to control obvious misconduct by the prosecution. *See State v. Roberts,* 838 S.W.2d 126, 131 (Mo.App.1992). That said, Missouri courts have been reluctant to criticize a trial court when it has declined to take action on its own motion on behalf of a party during the examination of a witness. Indeed, such invitations have been rejected in all but the most unusual circumstances. *See State v. Francis,* 60 S.W.3d 662, 671 (Mo.App.2001). There is sound reasoning behind such hesitance to require a trial court to take *sua sponte* corrective action. In *State v. Drewel,* 835 S.W.2d 494 (Mo.App.1992), the Eastern District stated:

> We do not expect trial judges to assist counsel in the trial of a lawsuit. Too often they are accused of trying "my law suit." They preside to judge a lawsuit. *Sua sponte* action should be exercised only in exceptional circumstances. In the case *sub judice* the judge was in a better position to evaluate the prejudicial effect of the proffered question and, although not objected to, determined that no harmful result occurred. Therefore, the trial court was correct in not offering a *sua sponte* declaration.

*Id.* at 498. Uninvited interference by the trial judge in trial proceedings is generally discouraged, as it risks injecting the judge into the role of a participant and invites trial error. *Cf. State v. Rhodes,* 988 S.W.2d 521, 526–27 (Mo. banc 1999) (discussing claim that trial court should have taken *sua sponte* action during closing argument). In certain circumstances, a trial judge's intervention in the proceedings may be unwelcome, as the failure to raise an objection may be a matter of trial strategy. *See State v. Francis,* 60 S.W.3d at 671.[5]

---

**5.** An alternative used by some trial judges where the issue is serious and the judge is

As *Drewel* counsels, the trial court should only take independent action in the most unusual and exceptional circumstances. Thus, we will rarely find plain error where a trial court has failed to take *sua sponte* action with regard to the proceedings. Ultimately, however, we need not decide whether plain error occurred in this matter, as Roper has not established that, upon the face of the record, a manifest injustice or miscarriage of justice occurred.

The focal point of Roper's defense was that the events that occurred inside Trenary's apartment were not as they were perceived by the police officers. While the credibility of the prosecution and defense witnesses is always at issue in a criminal case, it was a key issue in the case at bar. Where there is a dramatic difference between the testimony presented on behalf of the State and the defendant, the prejudicial effect of such questions, albeit improper, may be lessened or more difficult to establish. *See, e.g., Savory*, 893 S.W.2d at 411. Looking to the prejudicial effect of the questions, we note that the prosecutor did not directly refer or allude to that questioning during closing argument. While this lack of emphasis would not necessarily reduce the prejudice from the questioning, it certainly did not exacerbate it.

Ultimately, however, we cannot conclude that a miscarriage of justice or manifest injustice occurred for the simple reason that the evidence of Roper's guilt was substantial. *See State v. Womack*, 967 S.W.2d 300, 303 (Mo.App.1998). To hold that a miscarriage of justice or a manifest injustice occurred, we must determine that there is a reasonable probability that the jury's verdict would have been different, had the error not taken place. *See State v. Monath*, 42 S.W.3d 644, 651 (Mo.App. 2001). Here, the evidence admitted at trial, particularly the physical evidence, undermines Roper's claims as to what occurred took place during his confrontation with White and Trenary and the subsequent standoff with law enforcement.

Further, with regard to at least one of the topics in which the improper questioning was used, Roper's testimony was equivocal or contradictory. For example, in the testimony quoted above, the prosecutor was inquiring whether Roper had told the police that he had intended to kill Trenary. Roper denied having said anything to that effect. Yet, on direct examination, Roper had conceded that he had, in fact, told the police that he intended to kill her:

Q. Okay. Did you ever threaten to kill her while somebody was talking to you, the police officers were talking?

A. I think I might have—yeah, I know I said, "Yeah, I'm going to kill her."

Between the occasionally equivocal nature of Roper's testimony and the substantial evidence of his guilt, we do not believe that there is a reasonable probability that the jury would have reached a different outcome, had the trial court taken *sua sponte* action regarding the prosecutor's misconduct.

While we ultimately conclude that a manifest injustice or miscarriage of justice did not occur in the proceedings below, we

concerned about post-conviction proceedings is to call counsel to the bench and ask whether the non-objecting party is making a tactical decision. This procedure is not to be used just because the trial judge believes a proper objection could be made but only where the trial judge believes that the defendant's rights to a fair trial may be seriously compromised. Such a procedure does not leave the trial court as vulnerable to the charge of advocating for a party by suggesting or making an objection on its own.

do not want to minimize the fact that the prosecutor's questioning of Roper clearly violated our holding in *State v. Savory,* and constituted misconduct. Such questioning lacks any probative purpose and will not be condoned, as it invites reversible error.

However, in the present circumstances, we conclude that Roper has failed to make the requisite showing upon which we could reverse the judgment below on grounds of plain error under Rule 30.20. Therefore, we deny Roper's final point on appeal and affirm the judgment and sentence below.

PAUL M. SPINDEN, Presiding Judge, and LISA WHITE HARDWICK, Judge, concur.