STATE of Missouri, Respondent,

v.

Jeromie WALTERS, Appellant.

No. WD 66981.

Missouri Court of Appeals,
Western District.

Dec. 26, 2007.

Ellen H. Flottman, Columbia, MO, for Appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Shaun J. Mackelprang, Asst. Attorney General, Jefferson City, MO, for respondent.

Before RONALD R. HOLLIGER, P.J., HAROLD L. LOWENSTEIN, and JAMES M. SMART, JR., JJ.

JAMES M. SMART, JR., Judge.

Jeromie Walters was convicted after a jury trial of first-degree murder and armed criminal action. He brings two points on appeal. The judgment is affirmed.

### Background

Walters was charged for his involvement in the death of Stacy Baker. The relevant facts are as follows: In September of 2004, Walters and his cousin Derrick Sandow were spending time with Shanda Stillwell and Stacy Baker, the victim. At some point, the four of them were driving around, using drugs and drinking alcohol. Stillwell was driving, Walters was in the passenger seat, and Baker and Sandow were in the back seat. Walters and Baker had a dispute. Walters then got out of the car and started walking down the street. Soon after, Baker drove the car into Walters as he was walking down the street. The incident injured Walters and cracked the windshield of the car. Walters did not seek medical treatment for his injuries or report the incident to police.

The group did not see each other for a month or so, but during that time Walters and Sandow discussed getting revenge on Baker for hitting Walters with the car. On November 4, 2004, Baker, Stillwell, Walters, and Sandow were hanging out at Baker's trailer where she and Stillwell lived. Stillwell and Baker each went to bed in separate bedrooms. Walters and Sandow remained in the living room talking. Walters and Sandow began to discuss hurting Baker and taking her car and going to Michigan. Sandow showed Walters a switch blade that he had and suggested that they stab Baker. Walters agreed. Sandow checked on Baker to see if she was sleeping. When it appeared she was asleep, Sandow and Walters entered her room. Walters covered Baker's head with a blanket and put his weight on her to hold her down while Sandow stabbed her nine times with the switchblade. Sandow stabbed Baker in her right leg, groin, and abdomen area.

Stillwell was awakened by Baker's scream for help from the next room and ran to Baker's room to see what was the matter. Sandow had the knife and was offering it to Walters to continue the stabbing. Stillwell grabbed the knife while Walters grabbed Baker's car keys. He and Sandow fled, taking Baker's car. Baker got out of bed, grabbed a metal bat, and went outside. Stillwell ran to a nearby house where Baker's uncle lived and shouted that Baker was hurt. Baker's uncle called 911 and then he and others attempted to render assistance to Baker.

Paramedics arrived to help, but by the time they arrived Baker had no pulse. They were unable to revive her. One of the stab wounds had severed Baker's femoral artery, causing her to bleed to death.

Sandow and Walters, who had concocted a plan to go to Michigan, ran out of gas in Baker's car on Highway 13. They were found on a farm and arrested.

Before trial, Walters made a motion to disqualify Mr. John Hackett, the prosecuting attorney for Hickory County, because Mr. Hackett had previously represented Walters on a probation violation for a previous conviction. Hackett had also represented him on a motion to set aside the sentence on one count of that conviction. The court denied the motion, stating that there was no evidence that Mr. Hackett's previous representation could be used to Walters' disadvantage.

During trial, the jury heard the above-outlined evidence. Walters testified in his own defense. He admitted that he and Sandow entered Baker's room and that he held the blanket over Baker's head while Sandow stabbed her. He testified that his intention was not to kill Baker, but only to hurt her so that he and Sandow could steal her car. The jury returned a verdict of guilt of first-degree murder and armed criminal action. The court sentenced Walters to life imprisonment without the possibility of probation or parole for the first-degree murder count, and life imprisonment for the armed criminal action count, with the sentences to run concurrently. Walters appeals.

## Point I: Disqualification of the Prosecutor

 Walters' first point asserts that the trial court erred when it refused to disqualify Mr. Hackett, the prosecuting attorney for Hickory County. Walters raised this issue before trial, during trial, and in his motion for new trial. Generally, the court's decision on a motion to disqualify is reviewed based on the abuse of discretion standard. *State v. Wilson*, 195 S.W.3d 23, 25 (Mo.App.2006). When an attorney has previously represented the

defendant and then later prosecutes the same defendant on another charge, the applicable rule is Rule 4–1.9. *Id.* at 24. Rule 4–1.9 [1] states as follows:

A lawyer who has formerly represented a client in a matter shall not thereafter:

(a) represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client consents after consultation; or

(b) use information relating to the representation to the disadvantage of the former client except as Rule 1.6 would permit with respect to a client when the information has become generally known.

Here, Mr. Hackett previously represented Walters. Walters concedes in his brief that the convictions on appeal are not the same case in which Mr. Hackett represented Walters. Although he does not explicitly concede that these convictions are not "a substantially related matter," his brief is devoid of any demonstration that the convictions are a substantially related matter. There is no indication that those convictions had anything to do with the present prosecution.

Walters spends the majority of his argument on this point arguing that allowing Mr. Hackett to act as the prosecuting attorney created an "appearance of impropriety," citing *State v. Reinschmidt*, 984 S.W.2d 189 (Mo.App.1998), and related cases. In *Reinschmidt*, the court held that the defendant's former attorney's subsequent affiliation with the prosecutor's office created a rebuttable presumption of prejudice and the presumption was not rebutted where the defendant refused to

---

1. This rule has since been amended, and the new language became effective July 1, 2007.

The trial in this case was held in 2006.

waive the conflict. *Id.* at 192. In so holding, the court noted that the former attorney was the defendant's criminal defense attorney for more than two years on the *exact case* for which he was being tried after she went to work in the prosecutor's office. *Id.* Similar cases, such as *State v. Ross,* 829 S.W.2d 948 (Mo. banc 1992), were decided under similar factual scenarios. In *Ross,* two members of a law firm represented the defendant being sued in tort by the assault victim for the same incident for which he was being prosecuted. *Id.* at 949–50. The court held that this created an appearance of impropriety because the two attorneys also worked part time for the prosecutor's office, and, thus, the prosecutor's office was barred from prosecuting the case. *Id.* at 951. *Ross* and *Reinschmidt* involved attorneys who had virtually "switched sides" in the same or similar case. Moreover, neither *Ross* nor *Reinschmidt* contained any discussion of Rule 4–1.9.

In *State v. Smith,* 32 S.W.3d 532 (Mo. banc 2000), the prosecuting attorney had acted twice as the defendant's criminal defense counsel in cases that were sixteen and fourteen years earlier. The cases were unrelated to the current charges. *Id.* at 541. The court held that the prosecutor's connection to the defendant was *de minimis.* *Id.* at 542. Moreover, the court held that although the prosecutor used the defendant's prior conviction, one in which he had represented the defendant, the conviction was now a matter of public record and available to anyone. *Id.* Thus, the use of it was not unethical. *Id.* This court made no mention of the appearance of impropriety, but relied solely on the language provided in Rule 4–1.9.

Walters' case is similar to *Smith* in that, in accordance with Rule 4–1.9, there was no actual conflict with Mr. Hackett acting as the prosecutor in this case. Mr. Hackett's representation of Walters occurred years ago and was on a completely unrelated matter. Although Mr. Hackett did use the prior conviction against Walters in asking for his sentence, this prior conviction was a matter of public record. There is no evidence that Mr. Hackett used any knowledge gained while representing Walters to his disadvantage.

In arguing the motion to disqualify, Walters' attorney in this case admitted that he did not have any specific evidence showing that Mr. Hackett obtained information during his representation of Walters that would disadvantage Walters. Mr. Hackett did not deny his previous representation of Walters, but stated that he was not aware of any information he had that could disadvantage Walters. From the record, we see no indication that Mr. Hackett used anything gathered from his previous representation of Walters to Walters' disadvantage. The trial court did not abuse its discretion in allowing Mr. Hackett to proceed as the prosecuting attorney. Point denied.

### Point II: Argumentative Cross–Examination

■ Walters' second and final point pertains to questions asked of him on cross-examination. There was evidence that when Walters was interviewed after arrest, Walters stated that he did not want to be accused of "premeditating" the killing. Walters was cross-examined about this. Walters objects specifically to this exchange:

Q [by Mr. Scholz, the prosecutor]. Okay. When your [sic] talking to the highway patrol, how many times did you use the word premeditation?

A [by Walters]. I don't even remember using that word.

Q. You don't remember using that word?

A. No, not at all.

Q. So, when Sergeant Nash says you used the word several times, right?

A. I guess he did—I don't—

Q. I mean, you heard him testify up here in that chair right didn't you?

A. I heard him say a lot of things.

Q. Okay. You think—you're saying, you think Sergeant Nash is lying, don't you?

MR. LUTMAN [defense counsel]: Objection, that's argumentative, your Honor.

THE COURT: Overruled.

Q. (Cont. by Mr. Scholz) You think Sergeant Nash is lying, don't you?

A. He did say some things that weren't true.

██ Walters argues, as he did at trial, that such questioning was argumentative and improper. We agree. It is well established that witnesses should not be asked to comment on the veracity of another witness's testimony. *State v. Roper*, 136 S.W.3d 891, 900 (Mo.App.2004). When seeking to expose contradictory testimony, a prosecutor should not directly ask a witness if another was lying. *See State v. Savory*, 893 S.W.2d 408, 411 (Mo.App. 1995). Certainly it may be acceptable for one witness to be asked about whether some aspect of the testimony of another was accurate. But to ask a witness for an opinion as to whether another witness is lying is to invite an opinion as to someone else's state of mind that the witness is not qualified to give. We do not generally invite a witness to speculate on another witness's ability to accurately perceive and remember facts; there is even less justification for allowing a witness to speculate

as to whether another witness is deliberately attempting to mislead the fact finder. Such questions are argumentative and objections to them should be sustained. *Id.*

██ Nevertheless, conceding that the objection should have been sustained, we do not discern any prejudice. The question was isolated. Second, Walters avoided answering the specific question seeking comment on Sgt. Nash's veracity, responding only that Sgt. Nash said *"some things"* that *"were not true."* The answer was a response that could also have been given to a legitimate question. A witness may be asked whether in his or her perception a fact is true. That is not the same as expressing an opinion as to someone else's mental state in testifying. In other words, Walters refused to walk into the trap of calling Sgt. Nash a liar. The cross-examiner let it go at that and did not follow up the answer to get a more specific response.

Whether there was prejudice must also be considered in light of the overall evidence. The only real issue to be tried in the case was whether it was first-degree murder, which requires deliberation, or whether it was a lesser form of homicide. *See* section 565.020.1.[2] Walters admitted at trial that before he and Sandow instigated the attack on Baker, they sat in the living room and discussed stabbing Baker, taking her car, and going to Michigan. Walters acknowledged in his videotaped statement that he wanted to get revenge.[3] He also said that he wanted to "kick her (Baker's) head in." He said he went into her bedroom to "f— her up." Although Sandow had stabbed Baker in the lower part of her body (which does not by itself suggest intent to murder), there was also

---

2. Statutory references are to the Revised Statutes of Missouri, 2000.

3. Neither the videotaped nor the written confessions of Walters have been furnished to this court, but the jury saw them.

evidence that the stabbing was not complete at the time Stillwell entered the room, because Sandow was, according to Walters' confession, in the process of handing the knife to Walters for Walters to continue the stabbing. In rebuttal evidence presented by the State, a witness named Joseph Curtis testified that he was present when the defendant and Derrick Sandow had a conversation in which they agreed that they "ought to kill that bitch," referring to the victim. While Walters never agreed at trial that he deliberated actually *killing* Baker, as opposed to just *hurting* her, the evidence that Walters and Sandow planned and carried out the stabbing, and would have done more stabbing if not interrupted, created a substantial, reasonable inference that Baker's death was deliberated by Walters.

Walters' position at trial was difficult because of the culpable statements included in his written and videotaped confessions. When he tried to modify his answers somewhat at trial, he was effectively cross-examined in a way that revealed he was attempting to present a different version. The objectionable question about whether Sgt. Nash was lying was just a tiny part of an otherwise effective cross-examination designed to challenge Walters' credibility. Walters sidestepped the trap posed by the question, at least partially, as we have noted. That question, which Walters avoided answering, cannot reasonably be viewed as having had any effect on the jury's verdict.

## Conclusion

For all of the foregoing reasons, the judgment is affirmed.

HOLLIGER and LOWENSTEIN, JJ., concur.