Ronald L. HARRISON,
Movant–Appellant

v.

STATE of Missouri, Defendant–
Respondent.

No. SD 29519.

Missouri Court of Appeals,
Southern District,
Division Two.

Dec. 10, 2009.

Margaret M. Johnston, Columbia, MO, for Appellant.

Chris Koster, Attorney General, Mary H. Moore, Asst. Attorney General, Jefferson City, MO, for Respondent.

RALPH HASLAG, Special Judge.

This is the appeal of a judgment denying a motion for post-conviction relief filed by Ronald Lee Harrison (movant) pursuant to Rule 29.15.[1] Movant was convicted, following a jury trial, of second degree murder, § 565.021,[2] first degree robbery, § 569.020, and armed criminal action, § 571.015. He was sentenced to imprisonment for a term of life on the second degree murder conviction; a term of thirty years on the first degree robbery conviction, to be served concurrent with the sentence on the murder conviction; and a consecutive term of twenty years on the armed criminal action conviction. The judgment of convictions and sentences was affirmed by this court on direct appeal. *See State v. Harrison*, 213 S.W.3d 58 (Mo. App.2006). Following his incarceration, movant filed a motion for post-conviction relief as permitted by Rule 29.15. The motion was denied after an evidentiary hearing. We affirm the motion court's denial of movant's post-conviction motion.

The facts underlying movant's convictions and sentences are set forth in *State v. Harrison, supra*. The facts, as set forth

---

1. Missouri Rules of Court for Civil Procedure 2009.

2. Statutory references are to RSMo 2000.

in that opinion, are adopted and incorporated herein.

This case stems from the murder and robbery of movant's grandmother, Reba Magouirk (victim). On January 1, 2003, movant, who owed a drug debt to Keithy Frederick (Frederick), was at his sister Evelyn Blagg's (Evelyn) house. Movant was expecting Frederick to stop at the house and told another sister, Donna Tackett, and Donna's husband, Frankie Tackett, also present at Evelyn's house, to tell Frederick he was going for a walk. Frederick stopped by; he told the Tacketts to tell movant that he "wasn't one to be messed with."

On the morning of January 3, 2003, movant went to his work to pick up a paycheck in the amount of $255.81. Movant went to a grocery store in Campbell, Missouri, where he cashed the check and purchased a half pint of Jim Beam whiskey. Movant stopped by his cousin's house at around 10:30 a.m. where he borrowed a t-shirt, drank whiskey, and visited for about forty-five minutes.

Movant went to victim's house at around 11:30 a.m. Victim lived with her son, Jerry Magouirk (Jerry). Another son of victim, Rick Magouirk (Rick), also stayed with victim on occasion. Victim and Jerry were at the residence, a duplex, when movant arrived.

Victim's home health care worker, Karen Stevens (Stevens) arrived around 1:10 p.m. Stevens and Jerry noticed movant had been drinking. Jerry left around 1:30 p.m. Stevens left to run victim's errands. Movant went to sleep on victim's couch.

Stevens returned to the residence after running victim's errands. Stevens left the residence again at 2:30 p.m. to care for a man who lived across the street from victim. As Stevens was leaving, the mail carrier delivered victim's $400.00 social security check.

Around 5:30 p.m., victim's grandson, Joshua McMillen, drove by victim's house. Joshua saw movant standing in the doorway of his grandmother's house wearing a dark shirt with a white shirt underneath.

Around 6:30 p.m., Heather Lyons, who lived in the other half of the duplex where victim lived, heard three loud "bangs" coming from victim's residence. Also around that time, victim's son Rick was at a trailer neighboring his grandmother's house and saw movant drive by. Movant stopped and spoke with Rick for a couple of minutes, during which time Rick thought movant seemed "awful nervous."

Later, around 7:00 to 7:30 p.m., movant arrived at David Moore's house with a half-pint of whiskey. During his visit, movant told Moore he had $1,000 and showed Moore some folded cash. Movant left Moore's house around 8:00 p.m.

Rick went to victim's house shortly after 8:00 p.m. Rick saw victim sitting in her chair when he walked into the duplex. Rick thought victim was sleeping, but she did not respond when he tried to wake her. He then noticed that there was blood on victim's forehead and her left hand was jerking, so he called the police. Rick noticed that victim's purse was missing.

Victim was taken to Kennett hospital to receive treatment for her injuries where she was pronounced dead. An examination revealed victim had been struck over the head a minimum of seven times with a long, narrow, blunt instrument. The trauma to victim's head caused multiple skull fractures and brain injury. The forensic examiner estimated that victim's head injuries were received between 5:00 and 7:00 p.m.

Officers with the Campbell Police Department wanted to talk to anyone who

had seen or talked to victim that day. Deputy Terry Key interviewed movant. Movant told Deputy Key that he had taken a nap at victim's house from 11:30 a.m. to 3:00 p.m. Movant stated that after he woke from his nap, he watched television with victim until about 6:30 p.m. Movant stated that he then got victim's mail and put it on the coffee table before leaving for Moore's house. Movant stated he was at Moore's house from 7:00 to 8:00 p.m.

Movant was interviewed a second time by Sergeant William Cooper and Sergeant Jeffrey Heath. Movant repeated what he had told Deputy Key. Movant added that he left victim's house around 4:30 p.m. that day to purchase gas and cigarettes, but returned sometime thereafter. Movant stated that he brought in victim's mail and got her a glass of water before he left. Movant stated he was at Jerry Blagg's house when he learned that victim had been assaulted.

During a break in the interview, Sergeants Heath and Cooper were told that someone had seen blood on movant's shoes. When the interview resumed, Sergeant Heath asked movant if he could see his shoes. Movant obliged, and both officers saw what they believed to be blood droplets. Sergeants Heath and Cooper stopped the interview at that point and advised movant of his *Miranda*[3] rights. Movant stated that he understood his rights, and signed a written waiver. Movant stated that he did not have any idea where the blood had come from, and that victim was alive when he last saw her. Movant gave officers his consent to search his car and his clothes, which he said were in a bag at Jerry Blagg's house.

Movant was interviewed again January 9, 2003. Preliminary testing indicated that the blood splatter on movant's shoes was victim's blood. Movant was informed of the preliminary results, to which movant responded, "I couldn't do that." Movant asked if he was going to be arrested. Movant was told yes. Movant began to cry and said, "I don't remember. I don't remember.... I been [sic] doing—drinking alcohol and doing marijuana and meth up until three days ago." Movant stated, "I want the death penalty, I demand the death penalty."

Movant's clothes and shoes were sent to the Missouri State Highway Patrol Crime Laboratory. The DNA on movant's t-shirt and shoes matched the DNA of victim. Movant was charged with first degree murder, armed criminal action, and first degree robbery.

■ Appellate review of the denial of post-conviction relief under Rule 29.15 is limited to determining whether the motion court's findings and conclusions are clearly erroneous. *McFadden v. State*, 256 S.W.3d 103, 105–06 (Mo. banc 2008). The motion court's findings of fact and conclusions of law are presumed correct. *Strong v. State*, 263 S.W.3d 636, 642 (Mo. banc 2008). Its ruling will not be disturbed on appeal unless the appellate court is left with the definite and firm impression that a mistake has been made. *Anderson v. State*, 196 S.W.3d 28, 33 (Mo. banc 2006).

■ Movant presents one point on appeal. He asserts trial counsel was ineffective for failing to object to the State's cross-examination of movant regarding the truthfulness of another witness's testimony. Movant asserts a reasonably competent attorney would have objected to this line of questioning and, had trial counsel objected, a reasonable probability exists that the outcome of his trial would have been different.

---

**3.** *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

A movant must demonstrate trial counsel's performance was unreasonable and such unreasonable performance resulted in prejudice to establish a claim of ineffective assistance of trial counsel. *Taylor v. State,* 262 S.W.3d 231, 253 (Mo. banc 2008). A movant must demonstrate by a preponderance of the evidence that "trial counsel 'failed to exercise the customary skill and diligence that a reasonably competent attorney would perform under similar circumstances,' and that counsel's actions, or lack thereof, prejudiced the movant...." *Tinsley v. State,* 258 S.W.3d 920, 925 (Mo.App.2008).

To prevail on the first, or performance, prong of this standard, the movant "must overcome the presumptions that any challenged action was sound trial strategy and that counsel rendered adequate assistance and made all significant decisions in the exercise of professional judgment." *[State v.] Simmons,* 955 S.W.2d [729] at 746 [(Mo. 1997)] (citing *Strickland [v. Washington],* 466 U.S. [668] at 689–90, 104 S.Ct. 2052, 80 L.Ed.2d 674 [(1984)] ). In order to satisfy the second, or prejudice, prong of this standard, the movant must establish "a reasonable probability that the outcome of the proceeding would have been different but for counsel's ineffectiveness." *Evans [v. State],* 239 S.W.3d [191] at 194 [(Mo.App.2007)] (citing *Simmons,* 955 S.W.2d at 746). Both prongs are necessary for a finding of ineffective assistance; if either is not met, this Court need not consider the other, and the movant's claim must fail. *Id.*

*Tinsley v. State, supra.*

Movant contends trial counsel was ineffective for failure to object to the following cross-examination by the state:

Q. And when you talked to Deputy Key and Deputy Midkiff earlier that evening or that night, that is, on the night of the 3rd, early morning of the 4th when they talked to you, you told them you didn't leave the house between 3:00 o'clock when you woke up and 6:30 when you left when Wheel of Fortune was coming on?

A. No. I told them everywhere I'd went.

Q. Okay. And they just left that out of their report?

A. I guess so.

. . .

Q. And you didn't tell [Deputy Walter Dearing] that you'd been doing meth and marijuana and drinking for—until three days before that?

A. No.

Q. And you didn't tell him you hadn't slept since New Year's?

A. No, I did not.

Q. And you didn't tell him that you couldn't remember, you couldn't remember?

A. I remember everything.

Q. And you didn't say you wanted the death penalty?

A. No, sir.

. . .

Q. And all that's just made up by him? I mean, did somebody else say it while you were there?

A. I'm not calling nobody a liar but it was not said. And why it was even put there, I have no idea. That's something I can't answer.

As a general rule, decisions regarding whether or when to make an objection to evidence at trial are left to the judgment of trial counsel. *State v. Brasher,* 867 S.W.2d 565, 570 (Mo.App.1993); *State v. Suarez,* 867 S.W.2d 583, 587 (Mo. App.1993). Trial counsel's failure to object

to objectionable evidence does not establish a claim of ineffective assistance of counsel unless admission of the objectionable evidence resulted in a substantial deprivation of movant's right to a fair trial. *State v. Suarez, supra.* "Counsel's failure to object to particular evidence can constitute mere 'trial error' not rising to constitutional proportions and thus not cognizable in a post-conviction motion." *Id.* Trial counsel is presumed competent; a movant must overcome the presumption that trial counsel's failure to object was sound trial strategy. *Id.* A reviewing court will not reassess the judgment of counsel on questions of trial strategy, tactics or decisions. *State v. Brasher, supra.*

Movant fails to cite to, nor has this court's research revealed, any Missouri case law holding a trial counsel's failure to object to questions regarding the veracity of another witness's testimony constituted ineffective assistance of counsel. Movant, instead, cites to case law from Iowa to support his contention.

This court chooses to follow Missouri case law that has addressed the prejudicial effect of improper questioning of a witness such as occurred in this case under the plain error standard of review. *See, State v. D.W.N.,* 290 S.W.3d 814 (Mo.App.2009); *State v. Bescher,* 247 S.W.3d 135 (Mo.App. 2008); *State v. Roper,* 136 S.W.3d 891 (Mo.App.2004).[4] Although the standards of review applied in reviewing a claim of unpreserved error under the plain error standard and in reviewing a claim of ineffective assistance of counsel are distinguishable, it is only in rare cases that application of these standards of review would warrant post-conviction relief and not constitute plain error. *Skipper v. State,* 209 S.W.3d 552, 554 (Mo.App.2006).

. . . [The] theoretical difference in the two standards of review will seldom cause a court to grant post-conviction relief after it has denied relief on direct appeal, for, in most cases, an error that is not outcome-determinative on direct appeal will also fail to meet the *Strickland* test. Nonetheless, *Strickland* cautions that the distinction in the standards of review is important because there are a small number of cases in which the application of the two tests will produce different results. *[Strickland v. Washington,* 466 U.S. 668,] 697, 104 S.Ct. 2052 [1984].

*Deck v. State,* 68 S.W.3d 418, 428 (Mo. banc 2002).

■ "The law in Missouri is clear that witnesses may not be asked to give their opinion on the truth or veracity of another witness' testimony." *State v. Bescher, supra,* at 140. This type of questioning is inadmissible in that it usurps the jury's role of determining the credibility of the witnesses. *State v. D.W.N., supra,* at 817.

. . . [T]o ask a witness for an opinion as to whether another witness is lying is to invite an opinion as to someone else's state of mind that the witness is not qualified to give. We do not generally invite a witness to speculate on another witness's ability to accurately perceive and remember facts; there is even less justification for allowing a witness to speculate as to whether another witness is deliberately attempting to mislead the fact finder. Such questions are argumentative and objections to them should be sustained. *[State v. Savory,* 893 S.W.2d 408, 411 (Mo.App.1995)].

*State v. Walters,* 241 S.W.3d 435, 439 (Mo. App.2007).

---

4. *See also State v. Savory,* 893 S.W.2d 408 (Mo.App.1995)(case where objection to questions regarding veracity of another witness's testimony preserved, but no prejudice in that the defendant failed to show the question affected the jury's determination).

The appellants in *State v. D.W.N., supra, State v. Bescher, supra,* and *State v. Roper,* 136 S.W.3d 891 (Mo.App.2004), sought plain error review of the trial court's failure, in each of their respective trials, to *sua sponte* intervene to questions regarding the credibility of another witness's testimony without objection from trial counsel. In *State v. D.W.N., supra,* this court held the improper questions, and the trial court's failure to intervene *sua sponte,* was not plain error in that the totality of the circumstances indicated trial counsel's failure to object to the questioning was trial strategy. *Id.* at 826.

In *State v. Bescher, supra,* this court found no manifest injustice or miscarriage of justice occurred as a result of the prosecutor's improper questions in light of the overwhelming evidence supporting the defendant's conviction. *Id.* at 141. In *State v. Roper, supra,* this court determined no manifest injustice or miscarriage of justice occurred in that evidence of the defendant's guilt was substantial and there was no reasonable probability that the jury's verdict would have been different had the improper questioning not occurred. *Id.* at 903.

At the evidentiary hearing on movant's post-conviction motion, movant's trial counsel conceded the state's questioning was improper and objectionable. Co-counsel Robert Wolfrum recognized the basis for a legal objection to the questioning, but stated that he made a "snap decision" to not object because he thought movant "handled it fine." Mr. Wolfrum stated that the decision of whether or not to object and call attention to evidence is a matter of trial strategy. Co-counsel Beth Davis–Kerry likewise recognized that the state's questioning was objectionable. Ms. Davis–Kerry could not recall the reason why no objection was made, but stated that she would have objected if she had

thought her client was struggling. Ms. Davis–Kerry opined that movant had not struggled; that movant had handled the questioning. She stated, "[s]trategically, if I thought my client had been struggling at that point, I might have interrupted with an objection. Looking back on that, I actually think my client handled it pretty well." Ms. Davis–Kerry did not think an objection would have had any effect on the jury or affected the outcome of movant's trial.

The facts presented by the case now before this court are similar to those presented in *State v. Walters, supra.* The defendant in *Walters* was questioned as to whether the police officer who had interviewed the defendant was lying in his testimony at trial. *Id.* at 438–39. The defendant responded, "[h]e did say some things that weren't true." *Id.* at 439. This court found the prosecutor's questions were not prejudicial in light of the overall evidence, the fact that the question was isolated, and given the defendant's response. *Id.* This court found the defendant had "refused to walk into the trap" of expressing an opinion as to the officer's state of mind. *Id.*

> [Defendant's] answer was a response that could also have been given to a legitimate question. A witness may be asked whether in his or her perception a fact is true. That is not the same as expressing an opinion as to someone else's mental state in testifying. In other words, [defendant] refused to walk into the trap of calling [the officer] a liar.

*Id.* The court found it was "[c]ertainly" acceptable to question a witness as to whether the testimony of another witness is accurate. *Id.*

As in *State v. Walters, supra,* movant avoided the trap of expressing an opinion as to the interviewing officer's state of mind and calling the officer a liar. Movant

specifically stated that he was not opining that anyone was a liar, only that an aspect of the officer's testimony was not accurate. The question was an isolated occurrence.

The overall evidence before the jury supports movant's conviction. Movant claimed victim was alive the last time he saw her. Movant was at the victim's house during the time frame victim was assaulted. Blood droplets containing DNA consistent with victim's DNA was found on movant's shirt and shoes.

Trial counsel for movant explained at the evidentiary hearing that the decision not to object to the state's question was the result of trial strategy. Both Mr. Wolfrum and Ms. Davis–Kerry stated that they knew the question was objectionable, but decided movant answered the question well. The motion court found trial counsels' decision not to object was reasonable trial strategy. This finding is not clearly erroneous. In light of all the evidence, the isolated occurrence of the questioning, and movant's response, this court cannot find movant was denied a fair trial or that the outcome of his trial would have been different had counsel objected to the state's question. Movant's point on appeal is denied.

The judgment denying movant's motion for post-conviction relief is affirmed.

SCOTT, C.J., and RAHMEYER, J., concur.