

# Missouri Court of Appeals
## Southern District

### In Division

LARRY G. MCCONNELL,       )
                                 )
       Movant-Appellant,   )
                                 )
   v.                         )       No. SD37250
                                 )
STATE OF MISSOURI,       )       **Filed: February 23, 2024**
                                 )
       Respondent-Respondent.   )

### APPEAL FROM THE CIRCUIT COURT OF GREENE COUNTY

The Honorable Calvin Holden, Judge

### <u>REVERSED AND REMANDED</u>

Larry G. McConnell appeals the motion court's order denying his Rule 29.15 amended motion for post-conviction relief to set aside his convictions for three counts of statutory sodomy in the second degree and rape.[1]  McConnell's post-conviction motion presented two claims of ineffective assistance of counsel, both alleging his trial counsel failed to make certain evidentiary investigations, and he was prejudiced.  McConnell's two points on appeal contend the motion court clearly erred in denying each of these

---

[1] All rule references are to Missouri Court Rules (2018), unless otherwise indicated.
McConnell's conviction and motion for post-conviction relief preceded the 2021 amendments to
Rule 29.15.

1

claims.  Because the motion court's decision to deny relief after an evidentiary hearing was clearly erroneous, we reverse.

**Factual Background and Procedural History**

<u>Underlying Criminal Proceedings</u>

The State charged McConnell with three counts of statutory sodomy in the second degree for placing his hand on Victim's vagina (Count I), placing his penis in Victim's mouth (Count II), and touching his penis to Victim's hand (Count III) when she was less than 17 years old.  The State also charged McConnell with rape in the second degree (Count IV) for having sex with Victim without her consent on or after her seventeenth birthday.  The evidence adduced at trial was as follows.

Victim met McConnell, the fire chief for the Brookline Fire Department, when she began volunteering with the junior volunteer fire department program in September of 2015.  She was 16 years old at the time.  McConnell invited Victim to his farm after they discussed their shared interest in farming at a Fire Department Halloween function, and Victim thereafter started going to McConnell's farm "maybe once a week."

McConnell's behavior toward Victim began to change "right after Christmas" in January when McConnell let Victim drive his truck one day.  They were driving towards Springfield when she "slammed on the brakes because the light turned yellow," and McConnell hit the dash.  Victim got nervous, but McConnell assured her "nothing would ever happen to [her]" while she was with him.  McConnell then started rubbing the right side of Victim's shoulder and "started holding [her] hand . . . like a relationship couple would."

2

Victim testified at trial that "a couple weeks after" the truck incident, "[t]he next thing that happened, it was a Wednesday evening." Victim was in McConnell's home with him, "[h]e was watching TV in his recliner" and "his [Wife] had left for church." Victim specified Wife had driven "to church because she was still able to drive at the time[.]" While Wife was gone, McConnell pulled Victim on top of him "in a way of, like, cuddling." Victim testified they cuddled in the recliner, they moved to the couch in McConnell's living room, and he "[ran] his hands down [her] body" and "touched [her] vagina the first time[]" with his hands. She further testified that they then moved to McConnell's living room floor and laid next to each other, and he touched her vagina with his hands again. When the State asked where Wife was at this time, Victim testified, "[Wife] was at church." This incident ended after Victim stood up to help McConnell off the floor.

Victim also recounted a second specific instance of sexual abuse that occurred on another Wednesday night when Wife was at church. McConnell stood "face-to-face" with Victim and proceeded to pull her pants down "halfway" so he could "finger" her. The State questioned Victim specifically, "I know we're talking about Wednesday nights - - is that correct? - - when all these incidents happened?" Victim answered, "Yes." The State clarified, "And so on Wednesday nights when [Wife] would go to church?" Victim again answered, "Yes."

The State continued its line of questioning by asking whether "anything sexual happen[ed] on any other night of the week?" Victim replied, "There could have been occasionally, but it was, like, the same things" and further clarified, "The first time it occurred was on a Wednesday night when he had me alone."

3

Victim testified that the next instance of sexual contact, after the "face-to-face" incident, occurred on another Wednesday night. McConnell "would turn [her] around where [her] back was facing him, and he would kind of walk [her] where he wanted [her] to walk." They "walked into his hallway in his house, and he had [her] turn around facing towards him" and he did "the same thing where he'd stand face-to-face with [her] and play with [her] and touch [her]." He then put both his hands on her shoulders and "directed" her to get on her knees. When Victim got on her knees, he asked her if she wanted to see "him," referring to his penis. When she responded "no" twice, he "left it alone for that Wednesday."

According to Victim, the next sexual contact "was on the next Wednesday" immediately after the episode where McConnell pushed Victim to her knees. McConnell again pushed her shoulders toward the ground on her knees in the hallway, pulled his penis out of his pants, and directed her hand to touch his penis. Victim "kept saying no," but McConnell repeatedly asked her to "do it[.]" Victim's hand eventually touched McConnell's penis, and he put his penis into her mouth.

Victim's testimony confirmed all of these four, aforementioned specific incidents of abuse happened on Wednesdays prior to her 17th birthday. She also explained this "type of sexual contact" continued after McConnell forced her to perform oral sex on him. This sexual contact "would happen more often" on Wednesdays when Wife left for church and when McConnell had Victim alone in the house.

As Victim's testimony continued, she said the sexual contact progressed further after her 17th birthday, which was on March 2, 2016. On an unspecified day after she turned 17, McConnell told Victim it was now "legal" for her to have vaginal sex with

4

him.  McConnell walked with her to his bedroom, sat her on the edge of the bed, had her lay back, and rubbed his penis on her vagina.  Victim said she didn't "want this" and thought she would "go to hell" if she had sex before marriage.  McConnell did not listen and "just stuck it in there."  After this incident, Victim and McConnell maintained a consensual sexual relationship and had sexual contact in his house, the Brookline fire station, and a small farmhouse across the road from McConnell's home.  Their relationship ended "around May of 2017" when another woman took over Victim's job responsibilities at the farm.  McConnell did not testify at trial but offered five witnesses who claimed Victim's general reputation for truthfulness and veracity in the community was bad.

The trial court found McConnell guilty on all counts following a bench trial. When rendering its judgment, the trial court noted Victim was specific in her testimony that "most of the touching before she turned 17 was on Wednesday nights when [Wife] was at church."

<u>Rule 29.15 Post-Conviction Relief Proceedings</u>

McConnell's Rule 29.15 amended motion for post-conviction relief accused his trial counsel of providing ineffective assistance by failing to investigate and submit into evidence Wife's medical records and church attendance records.[2]  McConnell argued

---

[2] McConnell's brief includes a timeliness statement per Southern District Special Rule 20(a), and we have independently confirmed his Rule 29.15 motion was timely.  *See **Moore v. State***, 458 S.W.3d 822, 825-26 (Mo. banc 2015); *see also **Dorris v. State***, 360 S.W.3d 260, 268 (Mo. banc 2012).  McConnell filed a notice of appeal on January 29, 2020, following his conviction but later voluntarily dismissed his direct appeal before this Court rendered an opinion.  This Court issued the mandate from his direct appeal on April 14, 2020.  McConnell filed his *pro se* Rule 29.15 motion that same day, and thus his filing was within 90 days after this Court issued its mandate in

both records demonstrated Wife could not have driven to church and left him and Victim alone when Victim was 16 years old in January and February of 2016 and, therefore, he could not have committed the sexual abuse as Victim alleged. Wife's medical records, obtained by post-conviction counsel, state Wife had surgery on her right ankle on December 19, 2015, and had a "left tibial plateau fracture" in her left knee. Afterwards, Wife's right ankle was in a splint and her left leg was in an immobilizer. The medical records further describe Wife as "walking early" on February 3, 2016, when Wife was able to get around with "crutches/walker[.]" By March 3, 2016, Wife was able to walk with a "small limp" favoring her ankle.

The church attendance records, also obtained by McConnell's post-conviction counsel, show Wife's attendance on all Wednesdays from January through June of 2016 as follows:

---

his direct appeal. *See* Rule 29.15(b). The motion court thereafter appointed the Missouri State Public Defender to represent McConnell on August 26, 2020, and granted McConnell 60 days to file an amended Rule 29.15 motion. The motion court also granted McConnell two 30-day extensions to file an amended motion per Rule 29.15(g). With these extensions, McConnell's amended motion was due on December 24, 2020, 120 days from the appointment of counsel. Because December 24, 2020, was made a state holiday by Executive Order 20-20, McConnell's amended motion filed on the next business day of December 28, 2020, was timely. *See* Rule 44.01(a).

6

█████████ Church
Yearly Markings

**Master Group:** Music Program
**Groups:** Celebration Choir
**Event:** Music Program
**Year:** 08/01/2015 - 07/31/2016

**Days**

| Month | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| August | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| September | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| October | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| November | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| December | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| January | | | | | | A | | | | | | | A | | | | | | | A | | | | | | | A | | | | |
| February | | | A | | | | | | | A | | | | | | | A | | | | | | | A | | | | | | | |
| March | | A | | | | | | | P | | | | | | | P | | | | | | | P | | | | | | | | |
| April | | | | | | P | | | | | | | P | | | | | | | P | | | | | | | P | | | | |
| May | | | | P | | | | | | | P | | | | | | | P | | | | | | | | | | | | | |
| June | P | | | | | | | A | | | | | | | | | | | | | | P | | | | | | | A | | |
| July | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |

| | | |
|---|---|---|
| **Total Present:** | 12 | **Overall Date Last Attended:** 10/29/2017 |
| **Total Communion:** | 0 | **Master Group Date Last Attended:** 01/25/2017 |
| **Total Absent:** | 11 | **Roster Group Date Last Attended:** 01/25/2017 |

Wife was marked "A" and "[a]bsent" from her church's "Celebration Choir" group every Wednesday from January 6, 2016, to March 2, 2016, coinciding with the period when she was in a splint and immobilizer. Wife was first marked as "P" and "[p]resent" in 2016 for a Celebration Choir meeting on March 9, 2016.

The motion court granted McConnell an evidentiary hearing on his ineffective assistance of counsel claims in his motion. One of McConnell's trial counsel, Trial Counsel 1, testified there were "numerous" discussions regarding Wife's medical

7

problems and her being at home, he understood "Wednesdays were significant because that was church night[,]" and he knew "the issue" for McConnell's case was whether Victim was 17 or 16 years old when the abuse occurred. Trial Counsel 1 further testified the case was complicated because, while McConnell wanted to isolate the allegations to Wednesdays, Victim alleged abuse occurred at different locations, "not only in and around the area, but also on the road" and "outside in the barn." Trial Counsel 1 "always made the assumption that [Wife] couldn't drive" and did nothing to secure Wife's medical records. Trial Counsel 2, another one of McConnell's trial counsel, confirmed Victim's "birthday was the key date that everyone was looking at." Trial Counsel 2 also knew Wife could not drive when her leg was in a splint, that it took Wife six to eight weeks to recover, and that Wife did not go to her church on Wednesdays for "a period of time" after she broke her leg in December 2015. He did not try to get Wife's medical or church attendance records though, because he saw them as not "particularly helpful[.]" According to Trial Counsel 2, McConnell's alleged abused was not narrowed down to a particular time when Wife was away; and Victim testified about sex occurring "off and on for a year or more" and "in five or six different places" such as the fire station, a truck, a farmhouse, the basement, and in McConnell's bedroom. McConnell presented a trial transcript of his underlying criminal case, testified he discussed Wife's medical records and church attendance records with Trial Counsel 2, and said he saw Trial Counsel 2 at the same church Wife attended.

From this evidence, the motion court found McConnell's trial counsel did not render ineffective assistance of counsel. The motion court's findings of fact stated "there

8

is no evidence [Wife] was unable to drive during the period of time in question[,]" and, even if Wife could not drive:

> [McConnell's] trial counsel both testified the charged sexual acts occurred "all over the place," not just at the house. Thus, whether [Wife] was or was not at [McConnell's] house at the time of some of the sexual acts alleged to have occurred was not relevant in their preparation for the case.

The motion court determined further that McConnell suffered no prejudice from trial counsels' performance because, "[i]t is clear the abuse happened in many different locations, not just at the house, and not just while [Wife] was out at church[,]" and, the church and medical records would have only been useful to impeach Victim "[a]t best[.]"

### Standard of Review

> A circuit court's judgment denying postconviction relief will be affirmed unless its findings and conclusions are clearly erroneous. Rule 29.15(k); *Meiners v. State*, 540 S.W.3d 832, 836 (Mo. banc 2018). Findings and conclusions are clearly erroneous only when "this Court is left with a definite and firm impression that a mistake has been made." *Mallow v. State*, 439 S.W.3d 764, 768 (Mo. banc 2014).

*McFadden v. State*, 619 S.W.3d 434, 445 (Mo. banc 2020). When reviewing the denial of post-conviction relief, we interpret the facts "in the light most favorable to the verdict." *Davis v. State*, 653 S.W.3d 169, 171 (Mo. App. S.D. 2022) (quoting *Staten v. State*, 624 S.W.3d 748, 750 (Mo. banc 2021)). We presume the motion court's findings and conclusions are correct. *Id.*

### Analysis

To obtain post-conviction relief on the basis of ineffective assistance of counsel, a movant must demonstrate by a preponderance of the evidence: (1) counsel failed to exercise the customary skill and diligence a reasonably competent attorney would perform under similar circumstances; and (2) counsel's ineffective assistance prejudiced

9

movant.  ***Strickland v. Washington***, 466 U.S. 668, 687 (1984); ***Anderson v. State***, 564

S.W.3d. 592, 600 (Mo. banc 2018).  We retain a "strong presumption" that the assistance

of trial counsel was competent in this review.  ***Ryan v. State***, 660 S.W.3d 695, 698 (Mo.

App. S.D. 2023).

In Point I, McConnell claims the motion court clearly erred in overruling his Rule

29.15 motion "because he established that his trial counsel failed to act as a reasonably

competent attorney" because they were ineffective "for failing to investigate [Wife's]

medical records that showed she had limited mobility and could not drive during most of

January and February 2016."  He claims in Point II that the motion court clearly erred in

overruling his Rule 29.15 motion "because he established that his trial counsel failed to

act as a reasonably competent attorney" because they were ineffective "for failing to

investigate [Wife's] church attendance records that showed she did not attend church on

any Wednesday in January or February 2016."  For ease of analysis, we address both of

McConnell's points on appeal together.

<u>McConnell's Trial Counsel Provided Ineffective Assistance of Counsel</u>

A movant claiming ineffective assistance on the basis of counsel's failure to

investigate evidence must "(1) specifically detail the information his counsel failed to

discover, (2) establish that a reasonable investigation conducted by counsel would have

resulted in the timely discovery of such information, and (3) prove that the information

would have aided or improved his position at trial."  ***Hicks v. State***, 605 S.W.3d 95, 103

(Mo. App. S.D. 2020) (quoting ***Steele v. State***, 551 S.W.3d 538, 548 (Mo. App. E.D.

2018)).  "If trial counsel failed to investigate and introduce impeachment evidence, the

movant must demonstrate that such evidence either would have provided the movant with

a defense or changed the outcome of trial." ***Steele***, 551 S.W.3d at 548. A viable defense includes impeachment testimony that negates an element of a charged offense. ***State v. Laub***, 481 S.W.3d 579, 586 (Mo. App. S.D. 2015).

At his Rule 29.15 hearing, McConnell specifically detailed Wife's medical records and church attendance records and demonstrated trial counsel would have timely discovered both set of records through a reasonable investigation. Trial Counsel 1 admitted to discussing Wife's medical problems with McConnell numerous times, yet Trial Counsel 1 did not seek Wife's medical records. Trial Counsel 2, despite knowing Wife could not drive while her leg was in a splint and that Wife was not going to church after she broke her leg, did not attempt to secure either the medical records or church attendance records. As for why Wife's medical records and church attendance records would have aided or improved his position at trial, McConnell argues, as he did before the motion court, that both sets of records would "contradict [Victim's] testimony that any incidents of abuse occurred in January or February 2016 on Wednesdays when [Wife] had driven to church." This contradiction, if established, would refute Victim's account of sexual abuse, including when it first began. Wife's medical records and church attendance records would have therefore presented a viable defense or changed the outcome of the trial by negating the element of Victim's age from the charges of sodomy in the second degree under Counts I, II, and III.

It is a lawyer's duty to "explore all avenues leading to facts relevant to guilt and degree of guilt or penalty." ***Vickers v. State***, 632 S.W.3d 781, 786 (Mo. App. W.D. 2021) (quoting ***Cravens v. State***, 50 S.W.3d 290, 295 (Mo. App. S.D. 2001)). Wife's medical records and church attendance records were relevant to McConnell's guilt

11

because his convictions for sodomy in the second degree under Counts I, II, and III all required that he, "being twenty-one years of age or older, [had] deviate sexual intercourse with another person who is **less than seventeen years of age**." Section 566.064.1 (1994) (emphasis added). Victim unambiguously testified at trial that McConnell began abusing her "right after Christmas" and a couple weeks after the incident in McConnell's truck. Victim was 16 years old at this time but would only remain so until March 2, 2016, meaning McConnell could only be guilty of sodomy in the second degree if the finder of fact believed McConnell abused Victim at some point between "right after Christmas" and Victim's 17th birthday.

Victim described the first instance of sexual abuse as McConnell cuddling with her in his house and touching her vagina with his hands. She testified the first touching happened on "a Wednesday evening" when Wife "had left for church[,]" and Victim clarified she knew Wife was able to drive at this time. This was, by her words, "the first time" McConnell touched her vagina, and she further specified, "The first time it occurred was on a Wednesday night when he had me alone." This "first time" must have been before March 2, 2016, for McConnell to have committed the offense of sodomy in the second degree because by that date Victim was no longer "less than seventeen years of age." *See* section 566.064.1.

Victim then detailed three subsequent instances of sexual abuse: McConnell standing "face-to-face" with Victim and touching her vagina a second time, McConnell directing Victim to her knees and asking her if she wanted to see his penis with no penetration, and McConnell putting his penis in Victim's mouth. Victim testified these four, aforementioned incidents all happened on Wednesday nights, before her 17th

12

birthday, in McConnell's house, and when Wife was at church. These four incidents were the **only** specifically described encounters related to the charged incidents of sodomy in the second degree: Count I - McConnell placing his hand on Victim's vagina, Count II - McConnell placing his penis in Victim's mouth, and Count III - McConnell touching his penis to Victim's hand. The motion court's findings to the contrary, that "charged sexual acts occurred 'all over the place,'" and "the abuse happened in many different locations, not just at the house, and not just while [Wife] was out at church[,]" are clearly erroneous in light of this undisputed testimony at trial.

As the State questioned Victim specifically, "I know we're talking about Wednesday nights - - is that correct? - - when all these incidents happened?" Victim answered, "Yes." The State clarified, "And so on Wednesday nights when Wife would go to church?" Victim again answered, "Yes." Wife's medical records, however, strongly indicate she could not leave Victim and McConnell alone on those Wednesday nights after Christmas, as Victim alleged. Wife had one leg in an immobilizer and another in a splint, and the medical records further state Wife was largely immobile until February of 2016. The church attendance records also confirm Wife was absent each Wednesday from January of 2016 and through March 2, 2016, contrary to Victim's testimony that the specified incidents in January and February of 2016 occurred on Wednesday nights when Wife was at church. Wife's medical records and church attendance records thus refute Victim's testimony to the extent she described the sexual abuse related to the three counts of sodomy in the second degree as occurring on Wednesday nights in January and February of 2016 when Wife was at church. Both sets of records would have therefore provided McConnell with a viable defense to the three

13

charges of sodomy in the second degree in Counts I, II, and III by showing Victim was not under 17 years of age when McConnell started any sexual abuse.

An attorney's decision not to investigate must be reasonable in light of the circumstances. *Barton v. State*, 432 S.W.3d 741, 759 (Mo. banc 2014); *see also Smith v. State*, 370 S.W.3d 883, 886 (Mo. banc 2012) ("Counsel's strategic trial decisions only may serve as a basis for ineffective counsel if they are unreasonable."). The decision of McConnell's trial counsel to not investigate was unreasonable given their knowledge of Wife's medical records and church attendance records. McConnell's trial counsel had "numerous" discussions regarding Wife's medical condition, understood Wednesdays to be "significant because that was church night[,]" and knew "the issue" for their case was Victim's age when the abuse started. Trial Counsel 2 notably did not seek the medical records even though he was aware Wife was not attending church, and he knew Wife could not drive after December 2015 while her leg was in the splint, just before the sexual abuse allegedly began. Trial Counsel 1 merely assumed Wife could not drive without investigating further.

Not investigating Wife's medical records or church attendance records was additionally unreasonable in light of trial counsels' ignorance about their own case. *See Anderson v. State*, 66 S.W.3d 770, 776 (Mo. App. W.D. 2002) ("Thus, '[a]n argument based on trial strategy or tactics is appropriate only if counsel is **fully informed of facts** which should have been discovered by investigations.' *Clay v. State*, 954 S.W.2d 344, 349 (Mo.App.[E.D.]1997).") (emphasis added); *see also Cravens*, 50 S.W.3d at 295 ("Counsel lacked the information to make an informed judgment because of inadequacies in his investigation; therefore, any argument as to trial strategy is inappropriate."). Both

14

Trial Counsel 1 and Trial Counsel 2 described Victim's allegations of sexual abuse as not being limited to one location, and Trial Counsel 2 believed Victim did not narrow her allegations to any particular time when Wife was away, but Victim's trial testimony does not support those contentions. Victim's only reference to sexual activity occurring outside of McConnell's house was in regards to consensual activities after Victim's 17th birthday. Victim was unequivocal that the "first time" McConnell abused her was on a Wednesday, in the house, and when Wife was at church; and Victim only ever described sexual abuse from when she was 16 years old as happening in McConnell's house. Any later sexual encounters in the farmhouse, fire station, or other locations were irrelevant to the incidents that Victim testified happened when she was 16 years old.

The State, echoing the motion court's findings, maintains McConnell's trial counsel did not provide ineffective assistance of counsel because not impeaching Victim's testimony with Wife's medical history or church attendance records was a reasonable trial strategy.[3] A reasonable trial strategy cannot be the basis for an ineffective assistance of counsel claim, and a decision not to impeach a witness is

---

[3] The State additionally argues McConnell's trial counsel employed a reasonable trial strategy because Wife's medical records and church attendance records would have been difficult to admit into evidence without calling McConnell as a witness at trial. This argument is not well taken. Both the medical and church records would have been admissible as business records under section 490.680 (1949). A "business" includes "every kind of business, profession, occupation, calling or operation of institutions, whether carried on for profit or not[,]" and thus includes both a hospital and a church. Section 490.670 (1949); *see also* **State v. Ward**, 745 S.W.2d 666, 671-72 (Mo. banc 1988) (finding no error in a work record from a parochial day care center being admitted as a business record per a stipulation of the parties); **Caples v. Earthgrains Co.**, 43 S.W.3d 444, 452 (Mo. App. E.D. 2001) ("Generally, hospital records, when properly qualified, are admissible under the Business Records Act.").

15

presumed to be a matter of trial strategy. *Smith*, 370 S.W.3d at 886; *Byrd v. State*, 329 S.W.3d 718, 725 (Mo. App. S.D. 2010). "However, strategic decisions must be made **after** a thorough investigation of the facts relevant to the possible strategies." *Smith*, 370 S.W.3d at 886 (quotation marks omitted) (emphasis added). McConnell's trial counsel made no such investigation. Both trial counsel knew or should have known the medical records or church attendance records existed, yet neither sought either set of records to fully investigate a potential defense to the charges pending against McConnell. Had McConnell's trial counsel decided Wife's medical records and church attendance records were not useful after evaluating them, "we would not second-guess that decision." *Hannon v. State*, 491 S.W.3d 234, 245 (Mo. App. E.D. 2016). But in this instance, McConnell's trial counsel simply did not bother to investigate all relevant evidence and therefore could not make any reasonable trial strategy decision related to their use.

In *Hannon*, the failure to investigate and obtain potentially exculpatory evidence constituted ineffective assistance of counsel. *Id.* at 243-44. The evidence in question, school attendance records, contradicted the victim's testimony by proving he was not home sick from school on the specific day when the defendant allegedly sodomized him. *Id.* at 244. Because the *Hannon* court determined the attendance records were necessary to evaluate the best defense possible, it was unreasonable for trial counsel to not investigate them. *Id.* We likewise determine McConnell's trial counsel provided ineffective assistance of counsel by failing to investigate the potentially exculpatory medical records and church attendance records. Both sets of records would have spoken to "the central issue" as to whether McConnell sexually abused Victim before she turned 17 years old. *See Black v. State*, 151 S.W.3d 49, 55-56 (Mo. banc 2004) (holding trial

16

counsel was ineffective in failing to impeach multiple witnesses with prior inconsistent statements related to the "central issue" of defendant's intent). McConnell demonstrated his counsel failed to investigate Wife's medical records and church records, which would have provided him with a defense – impeachment evidence negating the element of Victim's age when the sexual encounters occurred from the charged offenses – or changed the outcome of trial. *See Steele*, 551 S.W.3d at 548.

### McConnell was Prejudiced by Trial Counsels' Failure to Investigate and Submit Wife's Medical and Church Attendance Records

We now consider whether the ineffective assistance of McConnell's trial counsel resulted in actual prejudice to McConnell. Prejudice, for purposes post-conviction relief, requires a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Ryan*, 660 S.W.3d at 699 (quoting *Strickland*, 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Hosier v. State*, 593 S.W.3d 75, 81 (Mo. banc 2019) (quoting *Deck v. State*, 68 S.W.3d 418, 426 (Mo. banc 2002)). "[T]he question is not whether the error would likely have produced a different result, but whether defendant suffered a genuine deprivation of his right to effective assistance of counsel in which the Court's 'confidence in the fairness of the proceeding is undermined.'" *Hannon*, 491 S.W.3d at 247 (quoting *Deck*, 68 S.W.3d at 428).

McConnell argues he was prejudiced by his trial counsels' failure to investigate Wife's medical records and church attendance records because, had trial counsel presented either piece of evidence, there is a reasonable probability he would have been acquitted. We recognize the mere failure to impeach a witness is generally insufficient to warrant post-conviction relief. *Brown v. State*, 450 S.W.3d 847, 851 (Mo. App. S.D.

17

2014); *Frazier v. State*, 431 S.W.3d 486, 494-95 (Mo. App. E.D. 2014). Nonetheless, trial counsels' ineffective assistance prejudiced McConnell here because, as we have already determined, either Wife's medical records or church attendance records "would have provided [McConnell] with a defense or changed the outcome of the trial." *Steele*, 551 S.W.3d at 548.

As McConnell identifies, both sets of records would have made it more likely that the fact-finder would have determined the incidents of sexual abuse did not occur until after Victim's 17th birthday. While Victim testified four specific incidents of sexual abuse occurred on Wednesday nights, beginning a "couple weeks" after Christmas, in McConnell's home, when Wife "drove" herself to church, and before Victim turned 17 on March 2, 2016, Wife's medical records show it was unlikely she could drive anywhere before Victim's 17th birthday. Wife's right ankle was in a splint and her left leg was in an immobilizer in January of 2016 following a fall in December of 2015, and Wife was only able to move with crutches or a walker in February. The church attendance records also confirm Wife did not attend her church functions on any Wednesday in January or February of 2016, and she only returned to her Wednesday night choir meetings at church after Victim's 17th birthday, March 2, 2016. Viewed together and separately, both sets of records refute and contradict Victim's account of when McConnell's sexual abuse started. The fact finder could still determine McConnell sexually abused Victim, but there is still a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different" as to the charges of sodomy in the second degree. *Ryan*, 660 S.W.3d at 699 (quoting *Strickland*, 466 U.S. at 694).

18

Turning to the motion court's specific findings, we note its stated basis for finding no prejudice does not accurately reflect the record. It found McConnell suffered no prejudice from the absence of Wife's medical records or church attendance records because it was "clear the abuse happened in many different locations, not just at the house, and not just while [Wife] was out at church." Victim did speak to sexual encounters in multiple places after she turned 17 years old, but her testimony about the specifically described sexual acts when she was less than 17 years old was limited to the four specific Wednesdays in McConnell's house while Wife was at church. She also explained this "type of sexual contact" continued after McConnell forced her to perform oral sex on him. This sexual contact "would happen more often" on Wednesdays when Wife left for church and when McConnell had Victim alone in the house. Establishing whether these Wednesdays were before or after March 2, 2016, was crucial for McConnell's defense. Because trial counsel failed to investigate and submit evidence that could have caused the trial court to disbelieve Victim's testimony, and negate an element of the statutory sodomy charges, the motion court's finding that McConnell was not prejudiced by trial counsels' errors was clearly erroneous. *See Black*, 151 S.W.3d at 58 ("If believed by the jury, there is a reasonable probability that the outcome of the trial would have been different."); *see also Cravens*, 50 S.W.3d at 296-97 (finding counsel's failure to consult with an available expert witness prejudicial where the expert testimony could have caused the jury to disbelieve witnesses for the State).

There is also a reasonable probability that McConnell could have been acquitted of rape in the second degree under Count IV but for trial counsels' ineffective assistance of counsel. A finding of guilt under Count IV was dependent on a credibility finding that

19

the first time McConnell had sexual intercourse with Victim was not consensual, even though subsequent encounters were, by Victim's own testimony, consensual. Coupled with Victim's testimony being contradicted by Wife's medical records and church attendance records, trial counsels' attacks on Victim's poor reputation in the community for truth telling could have convinced the trial court to disbelieve the rest of Victim's testimony.

The State argues McConnell failed to show he suffered prejudice because he did not prove Wife's medical records or church attendance records would "have given rise to reasonable doubt or changed the outcome of the trial[.]" According to the State, Victim testified the sexual abuse occurred on days other than Wednesday, and, therefore, neither set of records would have fully impeached her testimony. We note Victim's testimony recounted four specific instances of abuse when she was allegedly still 16 years old, and she confirmed all of those instances occurred on Wednesdays when Wife was at church. After this confirmation, the State asked, "And was anything sexual happening on any other night of the week?" Victim testified in response:

> **There could have been occasionally**, but it was, like, the same things. He was standing in front of me and fingering me and doing those same things. The first time it occurred was on a Wednesday night when he had me alone.

(Emphasis added). A noncommittal answer that sexual abuse "could have" occurred on other days does not reflect positive testimony that McConnell abused Victim on days other than Wednesday.

However, even if there was sufficient evidence for the trial court to convict McConnell of sodomy in the second degree such that trial counsels' performance had no outcome-determinative impact on McConnell's trial, our inquiry into prejudice would not

20

end. "[I]n most cases, an error that is not outcome-determinative on direct appeal will also fail to meet the *Strickland* test." *Deck*, 68 S.W.3d at 428; *Zych v. State*, 81 S.W.3d 96, 99 (Mo. App. E.D. 2002) (stating similar). But, McConnell need not make a showing of outcome-determinative error here. *Moore v. State*, 827 S.W.2d 213, 215 (Mo. banc 1992) ("[T]hough the [evidence] *may* not have changed the result, that very real probability cannot be ignored, and meets the minimum standard of undermining confidence in the outcome of the case."). "*Strickland* clearly and explicitly holds that an outcome-determinative test cannot be applied in a post-conviction setting." *Deck*, 68 S.W.3d at 427; *Schnelle v. State*, 103 S.W.3d 165, 177 (Mo. App. W.D. 2003) (stating similar). While a claim of plain error on direct appeal requires outcome-determinative prejudice, a movant need only show there is a "reasonable probability" the proceeding's result would have been different to establish prejudice for post-conviction relief. *Hosier*, 593 S.W.3d at 81; *Anderson v. State*, 196 S.W.3d 28, 38 (Mo. banc 2006) ("[A] finding of ineffective assistance of counsel requires a level of prejudice below that required for plain error."). This Court has cautioned "only in rare cases" will an error warrant post-conviction relief even though it may not rise to the level of outcome-determinative prejudice. *Harrison v. State*, 301 S.W.3d 534, 539 (Mo. App. S.D. 2009); *Skipper v. State*, 209 S.W.3d 552, 554 (Mo. App. S.D. 2006). With that understanding in mind, we find McConnell's situation represents one of those rare cases.

The failure of McConnell's trial counsel "to pursue the evidence readily available to [their] office [fell] outside the range of reasonably competent professional behavior[,]" and there is a reasonable probability of a different result at trial had McConnell's trial counsel investigated Wife's medical records and church attendance records. *Moore*, 827

21

S.W.2d at 215. McConnell's convictions for statutory sodomy were wholly dependent on Victim's recollection of sexual abuse starting during a two-month period before her 17th birthday. McConnell's trial counsel knew or should have known evidence existed which would have controverted Victim's testimony about when any sexual abuse began, showing the trial court she was mistaken or untruthful. We hold McConnell suffered a genuine deprivation of his right to effective assistance of counsel such that this Court's "confidence in the fairness of the proceeding is undermined." *Hannon*, 491 S.W.3d at 247 (quoting *Deck*, 68 S.W.3d at 428). Trial counsels' failure to investigate and submit Wife's medical records and church attendance records thus prejudiced McConnell.

## Conclusion

Points I and II are granted. The motion court's findings that McConnell's trial counsel did not provide ineffective assistance of counsel and that no prejudice resulted are clearly erroneous. The order denying McConnell's Rule 29.15 motion for post-conviction relief is reversed; McConnell's conviction and sentence for Counts, I, II, III, and IV are vacated; and the cause is remanded for a new trial.

JENNIFER R. GROWCOCK, J. – OPINION AUTHOR

JEFFREY W. BATES, J. – CONCURS

DON E. BURRELL, J. – DUBITANTE WITH OPINION

22


| | | | |
|---|---|---|---|
| LARRY G. MCCONNELL, | ) | | |
| | ) | | |
| Movant-Appellant, | ) | | |
| | ) | | |
| v. | ) | No. SD37250 | |
| | ) | | |
| STATE OF MISSOURI, | ) | **Filed: February 23, 2024** | |
| | ) | | |
| Respondent-Respondent. | ) | | |

APPEAL FROM THE CIRCUIT COURT OF GREENE COUNTY

The Honorable Calvin Holden

**DUBITANTE OPINION**

I reluctantly vote *dubitante*. I doubt that the motion court's decision must be reversed, but I cannot unequivocally state that the majority opinion is wrong. As a result, I write separately to point out that my difficulty is due to the lack of clarity in the standard of review that governs denials of post-conviction relief as it is currently articulated in our case law.

Rule 29.15(k) states that appellate review "shall be limited to a determination of whether the findings and conclusions of the [motion] court are clearly erroneous."[1] "Clearly" erroneous sounds like a high standard. In fact, in looking at what is required to demonstrate plain error under Rule 30.20, the word "clear" accompanies "evident" and "obvious" in describing the level

---

[1] Unless otherwise indicated, all rule references are to Missouri Court Rules (2018).

1

of error that might qualify for discretionary plain-error review.  *See **State v. Snyder***, 592 S.W.3d 375, 380 (Mo. App. S.D. 2019).

Rule 29.15 requires the motion court to draft a written order that covers two distinctly different things:  (1) findings of *fact*; and (2) conclusions of *law*.  Rule 29.15(j).  In regard to findings of fact, "we will defer to the motion court's determinations of credibility, and the motion court [(just like a circuit judge in a bench-tried case)] is free to believe all, part, or none of the witnesses' testimony."  ***Durst v. State***, 584 S.W.3d 817, 819 (Mo. App. S.D. 2019) (citing ***Zink v. State***, 278 S.W.3d 170, 192 (Mo. banc 2009)).  And, as the majority correctly notes, we must also view the facts in the underlying criminal case "in the light most favorable to the verdict."  ***Davis v. State***, 653 S.W.3d 169, 171 (Mo. App. S.D. 2022) (quoting ***Staten v. State***, 624 S.W.3d 748, 750 (Mo. banc 2021)).  Finally, we presume that the motion court's findings and conclusions are correct.  ***Id.***

In light of the language of Rule 29.15 and the above-cited principles of well-established law, it seems odd to me that our high court describes the standard of review as follows:

> Findings and conclusions are clearly erroneous only when "this Court is left with a definite and firm impression that a mistake has been made." *Mallow v. State*, 439 S.W.3d 764, 768 (Mo. banc 2014).

***McFadden v. State***, 619 S.W.3d 434, 445 (Mo. banc 2020).[2]

The standard begins well, "definite and firm" being commonly defined as "free of all ambiguity, uncertainty, or obscurity"; "having distinct or certain limits"; "securely or solidly fixed in place"; and "not weak or uncertain[.]"  MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY

---

[2] I pause here to note that I believe this is an improvement over other, earlier cases that added "*after reviewing the entire record,* the Court is left with a definite and firm impression that a mistake was made." *See, e.g.*, ***Ross v. State***, 335 S.W.3d 479, 480 (Mo banc 2011) (emphasis added).  The portion noted in italics seemed to be contrary to cases that hold that an appellate court is not required to "scour" the record to determine whether something in the record that was not referenced in the appellant's brief might allow the court to rule in the appellant's favor. *See, e.g., **Pate v. State***, 554 S.W.3d 419, 425 (Mo. App. S.D. 2017).

327, 471 (11th ed. 2005).  But uncertainty immediately follows "definite and firm" in the form of the ambiguous phrase "impression that a mistake has been made."

An "impression," at best, is defined as "an esp[ecially] marked and often favorable influence or effect on feeling, sense, or mind[.]"  MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 626 (11th ed. 2005).  At worst, it means "an often indistinct or imprecise notion or remembrance[.]"  *Id.*  Words like "impression," "influence," "feeling," "sense," "imprecise," "notion," and "remembrance," are not words typically associated with an appellate court's task of correcting errors of law.  To the contrary, they sound a lot like the kinds of things that fact-finders use to gauge the credibility of witnesses and weigh the value of various (often conflicting) bits of evidence to draw the inferences necessary to determine whether a defendant has committed a charged crime.

Worst of all (at least for someone who prefers "definite and firm") is the final, passive phrase -- "a mistake has been made."  Webster's Dictionary defines "mistake" as "a wrong action or statement proceeding from faulty judgment, inadequate knowledge, or inattention[.]"  MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 795 (11th ed. 2005).  Although I assume that a "mistake" that requires a reversal would surely be something more than a spelling or grammatical error in the motion court's written findings and conclusions, the word "mistake" is a large container, and I don't know how to determine what kind or level of mistake qualifies.

Finally, in addition to the difficulty in understanding and applying the standard of review as it is currently defined, the not-uncommon circumstance in this case is that the circuit judge in the underlying criminal bench-trial was the same judge that presided over Movant's post-conviction hearing.  During the evidentiary hearing on the motion, the church attendance and

3

medical records that Movant claims would have destroyed Victim's credibility and would likely have resulted in his being acquitted at trial were introduced into evidence for the judge to review.

Victim's credibility was critical to the State's "she said/he said" case. As the majority points out, Victim testified that the charged acts "would happen more often" on Wednesdays when Movant's wife was at church. Although that testimony from Victim would allow a reasonable fact-finder to infer that her statement that "most" of the acts took place on Wednesday nights meant that, although less often, similar acts also occurred on other days or nights of the week, I do agree with the majority that the church and medical records presented at the motion hearing could have been highly effective in impeaching Victim's credibility by proving that Movant's wife was probably at home instead of at church on all those Wednesday nights, and Victim was either lying or unreliable in relating what had happened when.

If Movant had been found guilty by a jury instead of having been convicted after a bench-trial, we might never know if there was a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Ryan v. State*, 660 S.W.3d 695, 699 (Mo. App. S.D. 2023) (quoting *Strickland v. Washington*, 466 U.S. 668, 694 (1984)). But under the circumstances of this case -- unless we assume that the judge was lying or abusing his judicial power instead of presuming that the motion court's findings and conclusions are correct -- we actually *do* know that the outcome of the case would *not* have changed if trial counsel had introduced the church and medical records at trial because the judge that convicted Movant denied post-conviction relief after hearing that additional evidence.

Was that ruling a reversible "mistake?" I doubt it, but for the reasons stated above, I'm just not sure.

DON E. BURRELL, J. – DUBITANTE OPINION AUTHOR